**UNITED STATES of America, Defendant-Appellant,**

v.

**John BABBS, Plaintiff-Appellee,**

and

**Lumbermens Mutual Casualty Company, Intervenor.**

No. 71–2331.

United States Court of Appeals, Ninth Circuit.

July 2, 1973.

309

Larry L. Dier, Asst. U. S. Atty. (argued), Robert L. Meyer, U. S. Atty., Frederick M. Brosio, Jr., Asst. U. S. Atty., Los Angeles, Cal., for defendant-appellant.

Mitchel J. Ezer (argued), Mizrahi, Geffen, Rich & Ezer, Los Angeles, Cal., for plaintiff-appellee.

John R. DiCaro, Fullerton, Cal. (argued), Demler, Perona, Webster & Langer, Long Beach, Cal., Ruston & Nance, Fullerton, Cal., for intervenor.

Before: KOELSCH and DUNIWAY, Circuit Judges, and RENFREW,* District Judge.

RENFREW, District Judge:

This action was brought under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. In February, 1966, an accident occurred in which Appellee Babbs was injured while engaged in the production of combustible cartridge cases being manufactured by his employer under contract with the United States. The Government appeals from a judg-

* The Honorable Charles B. Renfrew, United States District Judge, Northern District of California, sitting by designation.

ment against it for $175,000.[1] We affirm.

Babbs' employer, Western Molded Fibre, Inc. (WMF), had contracted with the United States through Picatinny Arsenal (Department of the Army) to manufacture combustible cartridge cases, the primary component of which was nitrocellulose fibre. Production began in late 1965, with Babbs as technical manager of the project. Babbs had no prior training or experience with military propellants or explosives. He was furnished with the military specification for the cartridge case, "Picatinny Arsenal Purchase Description [PAPD] 2616," and a handbook on explosives. It was primarily from these documents that Babbs learned about the nature of the materials with which he was working.

In the course of the manufacturing process, the cartridge cases were impregnated with a resin solution. The amount of resin contained in the finished product was subject to certain maximum and minimum standards. Babbs found that the resin content measurement was distorted by the absorption of moisture by the cartridge case components. He determined that drying the cartridge cases at 230°F. for 15 to 20 minutes before measuring the resin content would increase the accuracy of the measurement. Babbs reported this new procedure to his superiors at WMF and to the project engineer at the Arsenal. It was performed ten or twelve times, using an oven at WMF, and was successful in improving the reliability of the resin content measurement.

On February 8, 1966, there were to have been performed a number of acceptance tests on a production run of cartridge cases. Inspectors from the Arsenal were on hand to witness the tests, which were to be performed at Durkee Testing Laboratory. Durkee has certain facilities needed for the tests which were lacking at WMF. The drying of the cartridge cases was also to have been done at Durkee, prior to the resin content measurement. Babbs informed Durkee that this procedure would require an oven set at 230°F. He also passed on to Durkee all the information which had been furnished him by the Government outlining the test methods to be followed.

Babbs determined that a temperature of 230°F. was appropriate for the drying procedure, knowing that the ignition point of nitrocellulose was 300°F. and that the drying temperature would have to exceed 212°F., the boiling point of water, for the procedure to be effective. He also knew that at one point in the manufacturing process the cartridge cases were safely heated to between 250° and 265°F. Babbs' own experience with the material included several occasions on which he had seen or had been told of cartridge case components igniting. In none of these instances was there anything alarming about the burning. In addition, he had already performed the drying procedure ten or twelve times with no unusual results.

Two inspectors from the Arsenal went with Babbs to Durkee. Babbs checked the temperature of the oven, and the cartridge case samples were placed inside. Neither Babbs, the two inspectors, nor the Durkee employee present noticed anything unusual. After about fifteen minutes, however, a "click" was heard from the direction of the oven, and moments later the entire room was engulfed in flames. As a result of the fire, Babbs suffered extensive injuries.

In order to understand the cause of the accident, it is necessary to know something about the type of oven that was used. It is possible to classify ovens in two categories: directly heated and indirectly heated. A directly heated

---

1. Babbs was awarded $150,274.84. Judgment was given to intervenor Lumbermens Mutual Casualty Company in the sum of $24,725.16. Durkee Testing Laboratory, third-party defendant, was held not to have been liable and is not a party to this appeal.

oven has its heat source in the oven itself, while an indirectly heated oven has its source of heat removed from the chamber. Since the heat source in either type is likely to reach a considerably higher temperature than that in the oven chamber, an indirectly heated oven is preferable when heating a flammable substance such as nitrocellulose.

The oven at Durkee, however, was directly heated by an electric coil below the oven chamber, a fact that would not have been apparent upon a cursory inspection. The temperature of the heating coil reached temperatures well above the 230°F. in the chamber or the 300°F. ignition point of nitrocellulose. This higher temperature probably caused the fire in one of two ways: either by raising the temperature at the base of the oven above the critical point of 300°F., or by igniting dust-like fibres of nitrocellulose which had passed through crevices in the oven—the theory adopted by the trial court.

The Arsenal had promulgated in November 1964 a document entitled "P.A. Addendum to Para 2807—Ovens" (Para 2807), which dealt with standards for the design, installation and use of ovens in the heating of explosive and flammable materials. When read as a whole, this document indicates that the exercise of a great deal of caution is called for when using an oven to heat an explosive or flammable substance. Para 2807 specifically makes the following cautions:

"b(1)(d) Steam shall be used as the heating media wherever practicable.

(e) Whenever electric heating elements must be used, the elements shall be located where there is no possibility of contact with explosives or flammable materials.

\* \* \* \* \* \*

(i) Floor of oven shall be free of crevices and openings.

(2)(a) Ovens shall be \* \* \* so arranged as to afford maximum protection to personnel from the effects of an incident.

\* \* \* \* \* \*

(3)(b) The quantity of explosive material in an oven shall be limited to the type and quantity authorized for the specific oven.

\* \* \* \* \* \*

(e) Explosive materials shall not be placed on the floor of the oven."

The trial court's finding of negligence on the part of the United States was predicated on the Arsenal's failure to supply Babbs with this document and with a copy of PAPD 2616 containing a "paragraph 6.8," which provided that an oven temperature of only 100°F. ±5° was to be used in drying the cartridge cases. The Government argues on appeal that this omission was not negligent. Its position is that "[t]he trial court apparently felt that the handling of nitrocellulose involved specialized dangers of which Babbs \* \* \* was not aware," and that "[t]his finding is clearly erroneous." It is contended that Babbs' own negligence, and not that of the Government, was the proximate cause of his injuries. The Government also contends that Babbs, the employee of an independent contractor, cannot recover under the Tort Claims Act for injuries suffered in the performance of a contract with the United States.

*The Finding of the Trial Court that Appellee Was not Contributorily Negligent Was not Clearly Erroneous.*

Although a finding of negligence (or contributory negligence) is obviously a mixed finding of law *and* fact, this Court has consistently treated such findings as essentially factual. *E. g.,* Gertz v. McCarty, 450 F.2d 1104, 1105 (9th Cir. 1971); Ramos v. Matson Navigation Co., 316 F.2d 128, 131 (9th Cir. 1963). A finding of negligence, being treated as one of fact, is subject to the dictates of Rule 52(a) of the Federal Rules of Civil Procedure that such findings shall not be set aside unless "clearly erroneous." This Court has generally applied the "clearly erroneous" standard to findings of negligence in cases under the Tort Claims Act. *See, e. g.,* Spauld-

ing v. United States, 455 F.2d 222, 225 (9th Cir. 1972); El Paso Natural Gas Co. v. United States, 343 F.2d 145 (9th Cir. 1965); United States v. Fotopulos, 180 F.2d 631 (9th Cir. 1950).

■ ■ In determining whether the finding in this case that Babbs was not contributorily negligent is clearly erroneous, we may not merely substitute our judgment for that of the trier of fact. If reasonable men can draw conflicting inferences from the established facts, and the inferences drawn by the trial court are those which could have been drawn by reasonable men, its judgment must be affirmed. United States v. First Security Bank, 334 F.2d 120, 121 (9th Cir. 1964); Teren v. Howard, 322 F.2d 949, 952 (9th Cir. 1963); Lundgren v. Freeman, 307 F.2d 104, 113 (9th Cir. 1962). Appellee is entitled to have the evidence viewed in a light most favorable to him and to have the benefit of all reasonable inferences. Clostermann v. Gates Rubber Co., 394 F.2d 794, 796 (9th Cir. 1968); Stacher v. United States, 258 F.2d 112, 116 (9th Cir. 1958), cert. denied, 358 U.S. 907, 79 S. Ct. 232, 3 L.Ed.2d 228 (1958).

■ Following these guidelines, there appears to be substantial evidence to support the trial court's finding that Babbs was not contributorily negligent. Prior to the time he began work on the combustible cartridge case project, Babbs had no training or experience with military propellants or explosives, or with nitrocellulose in particular. His knowledge about the materials with which he worked came largely from the documentary information furnished by the Government and by his employer. The record indicates that none of the information read by Babbs on the subject of nitrocellulose led him to any appreciation of a substantial fire hazard.

The evidence, read in a light most favorable to appellee, would also support an inference that Babbs' own experience with nitrocellulose may not have caused a reasonable man to appreciate the enormity of the danger. He knew that the cartridge cases were safely exposed to temperatures of 250° to 265°F. at one point in the manufacturing process. On three separate occasions before the accident, Babbs had seen or had been told of cartridge cases igniting and burning with no alarming effects. Finally, the procedure he was performing when injured had been done a number of times without incident, although in a different oven; and neither his superiors at WMF nor personnel of the Arsenal who were aware of this added drying step indicated to him that any particular dangers were involved.

It is also significant that neither the Government inspectors present at the accident nor Durkee Testing Laboratory recognized any great danger in the heating procedure, although they were aware of the product description and testing methods outlined in PAPD 2616. One of the inspectors had been employed at the Arsenal for twenty-five years. He had previously observed testing of explosive materials and had some knowledge of nitrocellulose. Durkee, a professional laboratory in the business of supplying facilities for industrial testing, had been informed of the explosive nature of the material, and had been given all documents which the Government had furnished Babbs concerning the testing procedures to be followed. Yet the Government does not appeal the finding that Durkee, as third-party defendant, was innocent of any negligence, and it is not clear that Babbs can be charged with greater knowledge than Durkee about the dangers involved. Reading the record in the light most favorable to Babbs, we cannot say that it would be clearly erroneous to conclude that his own experience with nitrocellulose might have induced him to lower his guard and that it was reasonable for him to rely on Durkee to supply a proper oven for the drying procedure.

"[T]he test established by the Tort Claims Act for determining the United States' liability is whether a private person would be responsible for similar negligence under the laws of the State

where the acts occurred." Rayonier, Inc. v. United States, 352 U.S. 315, 319, 77 S.Ct. 374, 376, 1 L.Ed.2d 354 (1957); Roberson v. United States, 382 F.2d 714, 717 (9th Cir. 1967). The parties agree that California law is applicable here. The law regarding contributory negligence in California has been set forth in a number of cases. "Knowledge that danger exists is not knowledge of the amount of danger necessary to charge a person with negligence. *Doing an act with appreciation of the amount of danger, as well as of danger itself, is necessary to render a person negligent as a matter of law."* Varas v. Barco Mfg. Co., 205 Cal.App.2d 246, 262–263, 22 Cal.Rptr. 737, 747 (1962). Johnson v. Nicholson, 159 Cal.App.2d 395, 410, 324 P.2d 307, 315–316 (1958); Andre v. Allynn, 84 Cal.App.2d 347, 352, 190 P.2d 949, 952 (1948); Ridge v. Boulder Creek, etc., School Dist., 60 Cal.App.2d 453, 460, 140 P.2d 990, 993–994 (1943). That Babbs did not appreciate the degree of danger involved in placing the cartridge cases in the Durkee oven would be a legitimate and reasonable inference from the record, lending ample support to the trial court's finding that he was not negligent.

Unless it can be said that, even by taking the view of the evidence most favorable to appellee, no reasonable person could draw the inference that Babbs was unaware of the extent of danger involved in placing the cartridge cases in a directly heated oven, the trial court's judgment must stand. In light of the evidence in the record indicating that the only danger Babbs would have realized, had he known the nature of the Durkee oven, was the possibility of the samples being destroyed, we will not upset the ruling of the trial judge who had the opportunity to view the witnesses and determine their credibility.

Following the law of California in this case, as we must if the United States is truly to be liable "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, it appears that the courts of California have shown considerable reluctance to finding contributory negligence as a matter of law. California's stance on this point is illustrated by a recent case, Mark v. Pacific Gas & Electric Co., 7 Cal.3d 170, 101 Cal.Rptr. 908, 496 P.2d 1276 (1972), where an action was brought to recover for the alleged wrongful death of a college student who was electrocuted while attempting to remove a light bulb from a street lamp outside the bedroom window of his apartment. The trial court had entered a judgment of non-suit in favor of the defendants, but the California Supreme Court reversed as to the defendant power company on the ground that plaintiffs' evidence was sufficient to have supported a jury verdict in their favor.

The trial court had also held that the decedent was contributorily negligent as a matter of law. On the following facts (as set forth in the concurring and dissenting opinion of Chief Justice Wright), the California Supreme Court concluded that the decedent, who had observed his roommates remove the bulb successfully upon several occasions, was not guilty of contributory negligence as a matter of law. Thus, plaintiffs were entitled to a jury determination on the question of contributory negligence.

"The large two-and-one-half foot plastic canopy enclosing the bulb was secured to the steel pole by three metal clips which first had to be loosened or disengaged before the canopy itself could be removed. Thereafter it was necessary to extinguish the light by unscrewing the hot bulb from its porcelain socket. This could be accomplished by standing on a metal fire escape and leaning against or reaching across a metal railing. This action the decedent took while barefooted. With the canopy removed not only the bulb but also the heavy bare electrical terminals were exposed to sight and

touch. Through these terminals flowed current which powered such an intense light that one could read even with the drapes drawn and the room lights extinguished. To remove the bulb the decedent, wearing ski gloves, of necessity faced a bright light and reached his hands into an area which was within a few inches of the exposed terminals." *Mark, supra,* 7 Cal.3d at 185, 101 Cal.Rptr. at 917–918, 496 P.2d at 1285–1286.

In light of the controlling California law, as indicated by *Mark,* and the substantial evidence supporting the trial court's finding of no negligence on the part of appellee Babbs, we cannot say that this finding was erroneous.

*Appellee, an Employee of an Independent Contractor, Is Not Precluded from Recovering under the Tort Claims Act.*

■■ The Government also contends that it cannot be held liable for Babbs' injuries because it owed him no duty, arguing that an employee of an independent contractor cannot recover damages from one with whom his employer contracts. This position erroneously assumes that a requisite element of negligence is a duty owed the plaintiff based upon some direct relationship between him and the defendant. While there is a general rule that one who employs an independent contractor is not liable for injuries to the contractor's employees, there are exceptions to this rule. One exception imposes a duty upon the contractor and his employer when the work involved is "intrinsically dangerous." This duty, discussed at length in Van Arsdale v. Hollinger, 68 Cal.2d 245, 66 Cal.Rptr. 20, 437 P.2d 508 (1968), was recognized most recently by this Court in Thorne v. United States, 479 F.2d 804 (9 Cir. 1973). In *Thorne* we held that both the contractor and the United States, its employer, could be held liable for injuries suffered by the contractor's employee caused by their negligence where the activity was of a dangerous

nature. Here the activity engaged in by Babbs was obviously dangerous and accordingly the Government's contention that it did not owe Babbs a duty is erroneous.

The Government relies on United States v. Page, 350 F.2d 28 (10th Cir. 1965), and Eutsler v. United States, 376 F.2d 634 (10th Cir. 1967), for support of its contention that an employee of an independent contractor may not recover under the Tort Claims Act for injuries sustained in performing a government contract. The rule enunciated in *Page,* however, is based upon the law of Utah and not that of California. Even assuming *arguendo* that *Page* were the governing law, it is easily distinguished, for while the question there was the liability of the United States for the negligence of the contractor, we are concerned in the instant case with the negligence of the Government itself. *Eutsler* is also distinguishable, for plaintiffs in that case based their claim on the premise that:

"there is a direct common law duty [owed to employees of an independent contractor] on the part of the United States * * * when it directs an independent contractor to deal with inherently dangerous substances, to provide adequate safety regulations or to see that adequate safety regulations are followed by the independent contractor." 376 F.2d at 634–635.

The alleged liability of the Government was based not upon any negligence of its employees, but upon its relationship to the injured party.

Both *Page* and *Eutsler* stand for the proposition that a plaintiff may not recover under the Tort Claims Act solely because his employer was under contract with the United States. This does not affect the present action, however, for there is no attempt by Babbs to base the Government's liability merely upon the relationship between the parties. While this relationship would not be enough by itself to support Babbs' claims, it certainly does not preclude his

recovery, as the Government appears to suggest, providing he can show that the Government was negligent, and that the activity engaged in was "intrinsically dangerous."

*The Finding of the Court Below that the Government Was Negligent Was Not Clearly Erroneous.*

█ We think that appellee has shown facts sufficient to support the trial court's finding of negligence. His work on the combustible cartridge case project was performed according to the specifications set forth by the Government in PAPD 2616. The accident in which Babbs was injured took place in the course of an operation made necessary by product acceptance criteria and testing procedures contained in that document. Representatives of the Arsenal were aware that Babbs was oven-drying the cartridge cases before performing the resin content measurements, and Government personnel were present at the time of the accident.

The Arsenal had promulgated a document (Para 2807) dealing with the use of ovens for heating explosive and flammable materials which related directly to the work being performed by Babbs. Had he been provided with this information, the specific dangers involved in oven-drying the cartridge cases would have been apparent. Yet despite the Arsenal's recognition of the need for a document setting forth standards of oven design, installation and use to one in precisely the position of appellee, this information was not passed on to him. The Arsenal also neglected to furnish Babbs with a copy of PAPD 2616 containing paragraph 6.8, which prohibited the heating of the cartridge cases at a temperature above 105° F. Under these circumstances, we have no reservations in affirming the trial court's judgment that the Government was negligent in failing to provide Babbs with these documents and that this negligence was the proximate cause of his injuries.

Affirmed.