Willie Mae TOOLE, Deceased, and Clyde Toole, Administrator of Estate, and Clyde Toole, in his own right, Appellant,

v.

UNITED STATES of America.

No. 78–1168.

United States Court of Appeals,
Third Circuit.

Argued Sept. 7, 1978.

Decided Dec. 4, 1978.

Louis Samuel Fine, Fine, Staud & Grossman, Philadelphia, Pa., for appellant.

Robert N. deLuca, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief, App. Section, Alfred A. Gollatz, Asst. U. S. Atty., Philadelphia, Pa., for appellee.

Before SEITZ, Chief Judge, and ADAMS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal presents a difficult question concerning the liability of the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–80 (1976), for the death of an employee of an independent contractor engaged in the manufacture of antitank explosives for the United States Army.

### I.

Willie Mae Toole worked at the Philadelphia munitions plant of Action Manufacturing Company ("Action" or "Company"). She was engaged in the manufacture of the "fuze rocket," an antitank explosive that Action made for the United States Army. Specifically, her job was to "stake" together a primer and detonator, both of which contained explosive material. Sitting behind a plexiglass shield at a plywood table, Mrs. Toole would reach around the shield, hold a detonator in her left hand and a primer in her right, insert the primer into the detonator, and put that assembly onto a staking device[1] in the center of the table. She would then withdraw her hands behind the shield, press levers with each hand in order to operate the staking device, and finally remove the assembled product. Mrs. Toole might have had as many as 50 detonators and 350 primers at her table while she was performing this operation.

The staking device pressed together components that contained highly explosive material. As the contract between Action and the United States noted, a "fire and explosion hazard prevails throughout the entire [manufacturing] process . . . ."

On August 5, 1974, Mrs. Toole was staking a primer and a detonator. The parts that she was assembling, seven other detonators, and all of the primers at her table exploded, throwing her three or four feet from the bench. She died from the injuries. In his own right and as administrator of his wife's estate, Toole sued the United States in the United States District Court for the Eastern District of Pennsylvania for damages under the Federal Tort Claims Act, *supra*, asserting claims under the Pennsylvania Survival Statute, 20 Pa.C.S.A. § 3371 (1975), and the Pennsylvania Wrongful Death Statute, 12 P.S.A. §§ 1601–4 (1953). After a bifurcated nonjury trial on the issue of liability alone, the district court, in a thoughtful opinion, rendered judgment for the United States. Toole appealed. We are compelled to reverse.

An important background to the accident and suit is found in the contract between Action and the United States and in the efforts taken to enforce compliance with the contractual provisions. The contract under which Action manufactured the fuze rocket incorporated by reference Armed Services Procurement Regulation 7–104.79,

---

1. The staking device is a metal machine which, when activated by the operator, crimps the metal about the primer, thus securing the primer to the detonator.

32 C.F.R. § 7–104.79 (1975). According to that regulation, Action had to comply with the Department of Defense Contractors Safety Manual for Ammunition, Explosives and Related Dangerous Materials (DOD Manual 4145.26M). If a contracting officer in the Department of Defense discovered a violation of the manual and notified the contractor, the contractor was obligated to take immediate corrective action. Should the contractor fail to correct the violation, the contracting officer could postpone production until the contractor complied, or the contracting officer could even terminate the contract. Armed Services Procurement Regulation 7–104.79(b), 32 C.F.R. § 7–104.-79(b) (1975). Despite the requirement that a contractor abide by the manual, the regulation provided:

> Neither the requirements of this clause nor any act or failure to act by the Government shall affect or relieve the Contractor of his responsibility for the safety of his personnel . . . or impose or add to any liability of the Government for such safety.

*Id.* at § 7–104.79(d).

Among the requirements in the manual was a provision concerning safety shields. The provision required the contractor to install shields protecting employees from hazardous operations, and these shields had to be designed "in such a manner as to protect against the effects of not less than a 25 percent overload above the expected maximum charge [from an accidental explosion]." DOD Manual 4145.26M, § 603(f)(1) & (2). Under another section, rules were to be established governing the quantity of explosives to be kept in any one place, such as a work station. *Id.* at § 603(b)(1) & (2).

In order to discover whether the contractor was complying with the contract and obeying the manual, the Department of Defense, through an arm of the Defense Supply Agency, established an inspection system. On one occasion before the contract was awarded and at quarterly intervals af-

ter the award was made, inspectors from the Department of Defense surveyed Action's plant to ascertain whether the Company was in compliance. The inspectors reported to E. J. Slade, an Administrative Contracting Officer. When Slade learned that a contractor was not following the recommendation of an inspector, Slade would write to the contractor, requesting compliance within a specified time. If the contractor still failed to comply, Slade would investigate the reasons for the failure. Slade's last resort was to bring the violation to the attention of a Procurement Contracting Officer, who had the sole power to postpone work or terminate the contract.

On July 16, 1973, an inspector visited Action's plant. The inspector recommended that Action install a more effective shield around the staking operation.[2] Noting that Action had permitted as many as 50 detonators and 350 primers at the staking operation station at one time, the inspector also recommended reducing these numbers. In a subsequent letter to Action, Slade repeated the inspector's recommendations. Although Action's Contracts Manager, Joseph C. Brenner, promised compliance, the Company never fully corrected the hazardous conditions. An inspection in October again resulted in a letter from Slade and a promise by Brenner. After a third inspection, Slade wrote that "the proposed design [of the shields] should be tested with at least 25 percent overload before its use is permitted in operations." In reply, Brenner wrote that Action had tested a shield in an explosion of 25 detonators, and the shield had held fast. Since the manual required, as Slade had indicated, a shield able to withstand a 25 percent overload, rather than an explosion of 25 detonators, Action had not conducted the test with nearly enough explosives. A proper test would have involved the explosion of 500 units (each primer or detonator being a unit)—25 percent more than the 400 units that Action

---

**2.** The shield at Mrs. Toole's table had been built in connection with an earlier contract that Action performed for the United States. The

United States had supplied either the shield itself or a model that Action had copied.

was permitting at the staking operation. It is undisputed that Slade did not notify Action of its error.

At approximately the same time that Brenner wrote to Slade, the plant manager told an inspector, Leo Everett, about the test. Although Everett knew that Action had seriously misinterpreted the manual, the district court found as a fact that Everett did not alert the plant manager to the misinterpretation. Instead, he simply transmitted to Slade what the plant manager had told him. Everett also conducted the next inspection of the plant, and his report did not mention the faulty test. Three months after that inspection, the fatal explosion occurred.

## II.

■ Under the Federal Tort Claims Act, *supra*, federal district courts have jurisdiction to entertain suits against the United States for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." Since the acts or omissions upon which liability would be based took place in Pennsylvania, the law of that state governs. *Fisher v. United States*, 441 F.2d 1288, 1289 (3d Cir. 1971).

The Pennsylvania Survival Statute, *supra*, and the Pennsylvania Wrongful Death Statute, *supra*, create causes of action here only if, independently of the statutes, Pennsylvania law recognizes a duty owed by the United States to Mrs. Toole. In this appeal, Toole advances several theories according to

which the United States is said to owe a duty to the decedent. Under the Restatement (Second) of Torts (1965), Toole argues that the Government assumed a duty as the supplier of a dangerous chattel (section 388), as an employer giving negligent orders to an independent contractor (section 410), as an employer failing to exercise reasonable care in employing an independent contractor to do risky work (section 411), as an employer failing to provide contractually for special precautions in risky work to be done by an independent contractor (section 413), as an employer exercising control over an independent contractor (section 414), and as an employer responsible for its independent contractor's discharge of peculiarly risky work (section 416). The district court rejected these theories. We need not consider them here because we are persuaded that the Government is liable upon a different theory proposed by Toole, which is not grounded in the Restatement.

According to this theory, the United States is liable for its failure to warn either Mrs. Toole or Action about the inadequacy of the test for the shield and about the possible danger of relying on the shield. This duty to warn had arisen, Toole argues, because Mrs. Toole was engaged in an ultrahazardous activity. Employees of the Government knew of a special danger—the possible inadequacy of the shield—about which both the Company and Mrs. Toole were ignorant. Under these circumstances, Toole asks us to hold that the United States owed a duty to his wife, even though she was the employee of an independent contractor.[3]

Under similar circumstances, the Ninth Circuit has held that, according to California law, the Government owes a duty of warning to the employees of an indepen-

3. The appellant presented broad, shotgun allegations and arguments in the district court to support liability, and it was difficult to perceive his precise legal theories. No clear reference was made to direct negligence of the Government. Thus, it is not surprising that the district court omitted ruling on this issue. However, an examination of the appellant's memorandum of law in the district court reveals that Toole did advance, among a number of other theories of negligence, the proposition that the "Government knew of the danger to Mrs. Toole but never warned her" and was therefore negligent. Appellant also cited *United States v. Babbs*, 483 F.2d 308 (9th Cir. 1973), and contended that on the basis of that case the Government was negligent in view of Mrs. Toole's intrinsically dangerous activity. This theory of negligence was renewed in this court.

dent contractor. In *United States v. Babbs*, 483 F.2d 308 (9th Cir. 1973), the employee of a government contractor used an oven to dry explosive cartridges. The United States failed to supply this employee, Babbs, with a pertinent document and relevant specifications, which would have revealed the specific hazards of Babbs' methods. When a fire suddenly started in the oven, Babbs suffered extensive injuries. Asserting that the Government had a duty to warn him about the special danger of his methods, Babbs sued the United States for its negligence, rather than for the negligence of the independent contractor. The trial court granted judgment for Babbs, and the Ninth Circuit affirmed.[4]

Neither the research of the parties nor our own efforts have uncovered a Pennsylvania case adopting or rejecting a theory similar to the one from California law set out in *Babbs*. This is not altogether surprising. Under Pennsylvania law the question of an employer's duties in a case such as this one does not arise. Employers are liable under the theories of vicarious liabili-

ty stated in sections 416 and 427 of the Restatement (Second) of Torts (1965), whether or not they have breached a duty of care or acted negligently. Pennsylvania courts need not make a finding of fault to resolve these cases and thus can hardly be expected to produce precedents for factual and legal questions that are rendered irrelevant by the contours of Pennsylvania tort law.

■ But the Federal Tort Claims Act mandates determinations not required by Pennsylvania law. We must, therefore, forecast how the Pennsylvania courts would rule. *Suchomajcz v. Hummel Chemical Co.*, 524 F.2d 19, 24 (3d Cir. 1975). Under the facts of this case, we predict that the courts of Pennsylvania would find a duty owed by the employer of an independent contractor to the contractor's employees.[5]

■ Pennsylvania law recognizes that the employer of an independent contractor assumes a duty toward the contractor's employees when the contract demands peculiarly risky employment.[6] *Gonzalez v. Unit-*

**4.** By basing liability on the Government's own negligence rather than the independent contractor's, *Babbs* avoided the obstacle created by exclusion of vicarious liability under the Federal Tort Claims Act. *See* 28 U.S.C. § 2671 (1976) (only act by "employee of the Government" creates liability); *Gibson v. United States*, 567 F.2d 1237, 1242–44 (3d Cir. 1977), *cert. denied*, 436 U.S. 925, 98 S.Ct. 2819, 56 L.Ed.2d 768 (1978).

Toole's adoption of the rationale from *Babbs* also avoids the exclusion of liability for discretionary functions, which, if applicable, would bar imposing liability on the Government. Under 28 U.S.C. § 2680(a) (1976), the Federal Tort Claims Act does not permit suit for

[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

The Supreme Court has observed, "[w]here there is room for policy judgment there is discretion." *Dalehite v. United States*, 346 U.S. 15, 36, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). Interpreting *Dalehite*, this court has identified as discretionary those decisions calling for "policy judgments as to the public interest." *Griffin v. United States*, 500 F.2d 1059, 1064 (3d Cir. 1974). The decision whether or not to warn Mrs. Toole did not require any judgments

about policy. The Government did not need to reach "a balance of such factors as the cost of Government programs against the potential benefit." *Id.*

**5.** The United States did not relieve itself from liability to Toole by incorporating this exculpatory clause in its contract with Action: "Neither the requirements of this clause [setting out the safety manual as a contractual requirement] nor any act or failure to act by the Government shall . . . impose or add to any liability of the Government for . . . safety [of the independent contractor's employees]." Armed Services Procurement Regulation 7–104.79(b), 32 C.F.R. § 104.79(b) (1975), incorporated in the contract by reference. It was Toole to whom the United States owed a duty, and the Government did not relieve itself of that duty through Action's agreement to a limitation of its employees' rights. *Cf. Dilks v. Flohr Chevrolet, Inc.*, 411 Pa. 425, 435 n. 11, 192 A.2d 682, 687 n. 11 (1963) (defining exculpatory clause as provision "which deprives *one contracting party* of a right to recover for damages suffered through the negligence of the other contracting party" [emphasis supplied]).

**6.** The Pennsylvania courts will impose a vicarious liability upon the employer of an independent contractor even if the work to be done is not ultrahazardous. The employment need

*ed States Steel Corp.*, 248 Pa.Super. 95, 105, 374 A.2d 1334, 1339 (1977). Although the Pennsylvania cases rely on this duty to create vicarious liability, excluded from the Federal Tort Claims Act, *see* note 4 *supra*, they demonstrate a policy of placing on the employer an obligation to prevent accidents that would injure employees of an independent contractor engaged in risky activities. This policy is even more compelling when it is the employer's direct negligence that is the proximate cause of the injury.

■ Pennsylvania law has also recognized that an employer's superior knowledge may enable it to prevent accidents involving its independent contractor and may impose on the employer a duty to warn the contractor. In *Philadelphia Electric Co. v. James Julian, Inc.*, 425 Pa. 217, 228 A.2d 669 (1967), the Julian company had employed an independent contractor to build a guard rail. The Julian company knew that the guard rail would be over a gas main, but it never informed the independent contractor about the location of the main. While driving a fence post, the independent contractor hit the main and damaged it. Having made expensive repairs, the utility maintaining the line sued the Julian company. The Pennsylvania Supreme Court wrote:

> Even though Lee [the independent contractor] obtained from the Department of Highways plans and specifications clearly indicating the existence of the high pressure line, its employees either failed to notice or ignored its location. Furthermore, Julian knew that it was Lee's uniform practice to depend on the state inspector to stake out the exact location of the guard railing fence. It cannot be

said as a matter of law that a reasonably prudent man who had been doing business with Lee for years and was aware of its usual practice and never specifically mentioned the plans to Lee or requested it to check them, would be free from liability for neglecting to warn Lee of the presence of the gas main.

425 Pa. at 219–20, 228 A.2d at 671. This passage is only dictum, for the court eventually adopted a theory of vicarious liability. And the case concerns a duty to a third party rather than to the employees of an independent contractor. Nevertheless, this pronouncement of Pennsylvania's highest court supports the view that employers with superior knowledge of special dangers have a duty to warn independent contractors and that this duty inures to the benefit of those whom the independent contractor's normal operations may be expected to harm, including the contractor's employees.[7]

■ Here, employees of the United States knew that the staking operation performed at Action's plant was extraordinarily dangerous because both the primer and the detonator, which are secured together by the impact of the staking device, were charged with explosives. They knew that the plexiglass shield used by Mrs. Toole should have been able to withstand a blast of 500 detonators or primers to insure her safety and that it had been tested with only 25 detonators. They therefore knew that the shield might be unsafe. Despite this knowledge, the Government neglected to warn Action that the test was insufficient and that if there were an explosion the shield might not protect its employees from the blast. Under these circumstances, the

only entail a "peculiar risk"—" 'a risk different from the common risk to which persons in general are commonly subjected by the ordinary forms of negligence which are usual in the community. It must involve some special hazard resulting from the nature of the work to be done which calls for special precautions.'" *McDonough v. United States Steel Corp.*, 228 Pa.Super. 268, 276, 324 A.2d 542, 546 (1974), *quoting* "Comment (d)" to section 416, Restatement (Second) of Torts (1965). An ultrahazardous activity *a fortiori* entails a "special haz-

ard resulting from the nature of the work to be done."

7. In a case decided upon a theory of vicarious liability, a Pennsylvania court has written:

> Can an owner learn . . . that a contractor has failed to comply with safety requirements which he is contractually bound to undertake yet sit idly? We think not.

*Jacobini v. I.B.M. Corp.*, 57 D. & C.2d 8, 13 (C.P.Phila.), *aff'd mem.* 222 Pa.Super. 750, 254 A.2d 756 (1972).

courts of Pennsylvania would, we believe, hold that a private person in the Government's position owed a duty to Mrs. Toole and that the Government's failure at least to warn the contractor that the shield might be unsafe constituted a breach of that duty, which here was a proximate cause of the injury.[8] In view of the district court's findings of fact, we conclude, therefore, that the record in this case establishes the liability of the Government for negligence.

Because the liability of the United States is established, we remand for trial on the issue of damages. Costs taxed against the appellee.

8. Although we conclude that under Pennsylvania law the Government owed a duty to Mrs. Toole to warn her or the contractor about the inadequate test and the possible deficiency of the shield, we express no view on the question whether, in a case such as this one, Pennsylvania might require more than a warning from a reasonably prudent employer.