**Kenneth DRUMMOND and Tammi Drummond, Plaintiffs,**

v.

**DELAWARE TRANSIT CORPORATION and United States of America, Defendants.**

**No. CIV.A.02–040–MPT.**

United States District Court,
D. Delaware.

April 21, 2005.

---

Frederick S. Freibott, Esquire, The Freibott Law Firm, P.A., Wilmington, DE, for plaintiffs Kenneth and Tammi Drummond.

Rudolph Contreras, Esquire, U.S. Attorney's Office, Wilmington, DE, for defendant United States of America.

## MEMORANDUM OPINION

THYNGE, United States Magistrate Judge.

## I. INTRODUCTION

On January 15, 2002, plaintiffs, Kenneth and Tammi Drummond, initiated this action against defendants, United States of America and Delaware Transit Corporation ("DART"),[1] as a result of personal injuries that Kenneth Drummond ("Drummond") sustained during a traffic incident involving a United States Postal Service ("USPS") mail truck (the "mail truck") and a DART bus in which Drummond was a passenger.[2] Specifically, plaintiffs assert personal injury claims under the Federal Torts Claims Act ("FTCA"), 28 U.S.C. § 1346(b), 28 U.S.C. § 2679(B) and 28 U.S.C. §§ 2671–2680, alleging that the government is liable for injuries Drummond sustained as a passenger on the

DART bus. Tammi Drummond also seek damages for loss of consortium.

On October 10, 2003, the parties stipulated that jurisdiction in this matter be conferred to this court pursuant to 28 U.S.C. § 636(c), Fed.R.Civ.P. 73 and Delaware District Court Local Rule 73.1.[3] On September 8, 2004, a bench trial was held in this matter. The court's determination of plaintiffs' claims follows below.

## II. FINDINGS OF FACT

1. This case requires a determination of causation[4] for injuries sustained when DART's bus made a sudden stop to avoid colliding with defendant United States' mail truck (the "DART bus incident").

2. Drummond is a thirty eight year old construction worker. Prior to the DART bus incident, he had suffered from neck and knee pain. This pain was asymptomatic for approximately ten years before the DART bus incident.

3. On April 21, 2000, at approximately 5:00 p.m., Drummond was a passenger on a DART bus that was traveling through Wilmington, Delaware. He was seated in the middle of the last seat at the back of the bus. The bus was proceeding on Orange Street toward the intersection with Sixth Street. A postal vehicle[5] ran a stop sign at the intersection of Sixth and Orange Streets, causing the bus driver to slam on the brakes. Drummond was thrown approximately ten to fifteen feet into a door well, striking his head and neck on a metal pole.

5. Postal trucks are white and bear an insignia that includes an eagle, red and

1. The parties stipulated to the dismissal with prejudice of all claims against DART. D.I. 83.

2. D.I. 1.

3. D.I. 59.

4. The government conceded only liability, and not causation, during a teleconference on August 17, 2004.

5. Exhibit DX 2 at 20. The bus driver, Antoine Wiggins, testified that an older model USPS postal truck with red and blue striping and an eagle insignia on the side ran the stop sign.

blue stripes, and identification of the USPS. Postal vehicles are only permitted to be used in the course of employment. Postal vehicles are never permitted for personal use.

## III. CONCLUSIONS OF LAW

This opinion contains the court's findings and conclusions pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, based upon documentary and live testimony and other evidence presented at trial. Jurisdiction exists by virtue of the FTCA.[6] The FTCA extends to claims brought against the United States for money damages arising from the negligent acts or omissions of federal employees. The United States of America is a sovereign governmental entity which operates the USPS throughout the State of Delaware.

 Venue is proper within this court, because the acts and omissions complained of occurred within the District of Delaware.[7] Liability for tortious conduct is determined by the law of the state in which the conduct occurred.[8] Here, the acts and omissions are alleged to have occurred in Wilmington, Delaware. Thus, the court will apply Delaware law to determine the respective rights and liabilities of the parties to this action.[9]

**6.** 28 U.S.C. § 2671–2680.

**7.** 28 U.S.C. § 1402(b).

**8.** *See* 28 U.S.C. § 1346(b); *Anderson v. U.S.*, Civ. A. No. 93–589 MMS, 1996 WL 490262 at *5 (D.Del. Aug. 23, 1996) (citing *Molzof v. U.S.*, 502 U.S. 301, 305, 112 S.Ct. 711, 116 L.Ed.2d 731 (1992)); *U.S. v. Muniz*, 374 U.S. 150, 153, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963).

**9.** *See Emerson v. U.S.*, No. 96–437–SLR, 1998 WL 231023 at *5 (D.Del. April 29, 1998) (citing *Toole v. U.S.*, 588 F.2d 403, 406 (3d Cir.1978)).

### A. Causation

 To prevail in a negligence action under Delaware law, a plaintiff must show, by a preponderance of the evidence, that a defendant's negligent act or omission breached a duty of care owed to the plaintiff in a way that proximately caused the plaintiff's injury.[10] The plaintiff must show that the injury would not have occurred but for the defendant's conduct.[11] If the injury would have occurred regardless of defendant's conduct, then the defendant's conduct is not the cause of the injury.[12] Delaware law recognizes the traditional "but for" definition of proximate cause.[13] In Delaware, proximate cause is defined as the direct cause without which the injury would not have occurred.[14] In order to satisfy the "but for" test under Delaware law, the proximate cause must be one that occurs "in a natural and continuous sequence, unbroken by any intervening cause, produces the injury and without which the result would not have occurred."[15] The issue of proximate cause is determined on the facts.[16]

 The following undisputed facts demonstrate that the government's negligent conduct proximately caused injury to Drummond. Drummond was a passenger seated at the rear of a DART bus. The mail truck ran a stop sign, which caused

**10.** *Culver v. Bennett*, 588 A.2d 1094, 1096–97(Del.1991); *Duphily v. Delaware Elec. Coop., Inc.*, 662 A.2d 821, 828 (Del.1995).

**11.** *Culver*, 588 A.2d at 1097.

**12.** *Id.*

**13.** *See Duphily*, 662 A.2d at 828–29.

**14.** *See Laws v. Webb*, 658 A.2d 1000, 1007 (Del.1995) (quoting *Chudnofsky v. Edwards*, 208 A.2d 516, 518 (Del.1965)).

**15.** *Laws*, 658 A.2d at 1007 (quoting *James v. Krause*, 75 A.2d 237, 241 (Del.Super 1950)).

**16.** *Duphily*, 662 A.2d at 830.

the DART bus to make a sudden stop to avoid a collision. Consequently, the forward movement of the bus came to a sudden halt. As a result, Drummond was thrown forward from his seat and hit his head and upper torso on a pole inside the bus. Thus, through an unbroken sequence of events, the government's negligent conduct caused Drummond to fall and be injured. The court is persuaded that the evidence, including the testimony of Drummond and the DART bus driver, clearly shows that if the postal vehicle had not ignored the stop sign, the bus driver would not have been forced to slam on the brakes and Drummond, who previously had been seated, would not have been propelled into the pole. Thus, plaintiffs have proved, by a preponderance of the evidence, that the negligent acts of the United States proximately caused their injuries. The exact injuries plaintiffs sustained and the extent of those injuries is the focus of the remainder of this opinion.

### B. Damages

■ The court concludes that the United States is solely liable to plaintiffs for their damages, and that DART does not share in the liability. At trial, the government presented no evidence of negligence

on the part of the DART bus driver, Antoine Wiggins. Moreover, the testimony of the DART bus driver and Drummond is consistent with regard to the sequence of events.[17] Both testified that a USPS postal truck ran a stop sign forcing the bus to stop suddenly. Given the unrefuted consistent testimony and lack of evidence as to DART's negligence, the court holds the government solely liable for damages.

### 1. Past Medical Bills

Drummond seeks outstanding medical expenses incurred as of the date of trial.[18] Following the bus incident, Drummond was treated by a chiropractor and subsequently had arthroscopic surgery on his knee and surgery on his neck in which several cervical vertebra were fused. Drummond also had multiple surgeries on his arm to treat a broken humerus he suffered as the result of a fall in December 2001.

■ The government does not dispute the cost of treatment, but contends that some of Drummond's treatments were attributable to pre-existing conditions, were not related to the bus incident and/or were unnecessary.[19] The court finds that the treatment Drummond received for his knee, neck, and left shoulder injuries were

---

17. DX 2 at 22–28; trial transcript at 87–88.

18. JX 24. The total amount of medical expenses incurred for his injuries was $130,209.05.

19. Drummond was involved in an auto accident on June 8, 1999 and injured his neck. The only treatment for this injury was an emergency room visit shortly thereafter and two office visits with Dr. Amini, his family physician, in June 1999. Eleven years earlier in September 1988, Drummond had a work related accident and injured his neck, back and left knee. The x-rays taken of his neck and back for this accident were completely normal. Drummond, however, did complain of back spasms for a short period of time thereafter. Treatment for his knee com-

plaints was through bracing. Because of his continued complaints (pain and knee locking), Dr. Amini, referred Drummond to Dr. Noyes, an orthopedic surgeon, for evaluation and treatment. Dr. Noyes saw him one time in February 1989. Although arthroscopic surgery for his knee condition was considered, no such surgery was performed before the DART bus incident. After the referral to Dr. Noyes, Dr. Amini's notes do not reflect any continued knee complaints until after the bus incident. Dr. Amini treated Drummond from November 1979 until May 2000. Throughout the 1990s until the auto accident in 1999, Dr. Amini treated Drummond for a variety of complaints, including an injury to his left wrist and right forearm in 1993, and an injury to his left ribs in 1995. Between 1990 and the 1999 accident, however, no

a direct result of the DART bus incident. Although Drummond had pre-existing injuries from previous car and work accidents, the undisputed evidence confirms that those conditions were asymptomatic at the time of the DART bus incident.

Richard M. Gold, D.C., Drummond's treating chiropractor for his injuries from the DART bus incident, testified that his injuries were causally related to the DART bus incident.[20] Dr. Gold further testified that his pre-existing conditions were asymptomatic at the time of the bus incident.[21] Dr. Bikash Bose, the neurosurgeon who performed the cervical fusion on Drummond, also testified that Drummond's pre-existing conditions were asymptomatic at that time.[22] Elliott H. Leitman, M.D., Drummond's expert witness and treating orthopedic surgeon for Drummond's shoulder surgery, likewise opined that his pre-existing conditions were asymptomatic for approximately twelve years prior to the DART bus incident.[23] The government's expert witness, John Barry Townsend, III, M.D., testified that but for the DART bus incident, Drummond would not have required the treatment that he received thereafter.[24] The court is persuaded by the foregoing that any prior injuries and/or pre-existing conditions were asymptomatic at the time of the DART bus incident.

In addition to recovery of past medical expenses for chiropractic treatment and the surgeries on his neck and knee after the DART bus incident, Drummond seeks recovery of past medical expenses for multiple surgeries resulting from a fall in December 2001 in which he broke the humerus of his left arm near the shoulder. Drummond contends that fall was proximately caused by the injuries he suffered resulting from the DART bus incident.

The government contends that the shoulder injury Drummond sustained from his fall in December 2001, was not proximately caused by the DART bus incident. The government argues that Drummond was intoxicated when he fell and broke his arm. The government bases this argument solely on an emergency room notation of "ETOH" in Drummond's medical record.[25] No laboratory reports testing Drummond for blood alcohol content were admitted into evidence by the government, which suggests that none were performed. Moreover, Dr. Townsend, could not say with reasonable medical probability whether this single comment meant that Drummond consumed or was under the influence of alcohol on the night of his fall.[26] No other evidence was propounded by the government. This solitary entry is unpersuasive and insufficient to show that the fall was related to intoxication.

Drummond testified that he fell because his left knee gave out due to a knee buckling condition which developed in that knee after, and as a result of, the DART bus incident. Dr. Leitman testified that Drummond did not suffer from left knee buckling prior to the DART bus incident.[27]

---

treatment was provided or requested of Dr. Amini for any neck, back or knee complaints.

20. D.I. 79.

21. Id.

22. D.I. 78.

23. D.I. 77.

24. Dr. Townsend testified that, in general, the treatment provided for Drummond's injuries

was reasonable. Dr. Townsend is board certified in neurology and clinical neurophysiology. Trial Transcript at 52–55.

25. "ETOH" is the abbreviation for ethanol, i.e., alcohol.

26. Trial Transcript at 80.

27. D.I. 77 at 30–35.

Although Dr. Leitman confirmed that Drummond had evidence of bone spurs in his left knee, this condition was asymptomatic and does not cause buckling. According to Dr. Leitman, as a result of the DART bus incident, Drummond sustained injury to his left knee which required arthroscopic surgery in October 2000.[28] Unfortunately, a complication of such surgery is knee buckling, which caused Drummond to fall in December 2001 and injure his shoulder and aggravate his neck injury.[29] This fall lead to an open reduction and internal fixation (insertion of hardware) of the shoulder, a procedure performed by Dr. Leitman in April 2003.[30] Leitman further opined that the subsequent shoulder surgery in August 2003, for the removal of deep implant hardware with revision and internal fixation, was necessary because the hardware in the shoulder became loose.

Moreover, Dr. Townsend agreed that the DART bus incident aggravated Drummond's degenerative knee complaints. He also agreed that the physical therapy treatments for the knee, the arthroscopic knee surgery performed by Dr. Johnson and the two shoulder surgeries done by Dr. Leitman were reasonable and necessary.[31] Therefore, the court finds that the injuries sustained as a result of Drummond's fall in December 2001 were proximately caused by the DART bus incident.

The government also contends that Drummond's neck problems are the result of degenerative disk disease.[32] The government argues that any neck injury resulted from the June 8, 1999 automobile accident which occurred about a year before the DART bus incident.[33] The government, however, concedes that the DART bus incident may have exacerbated this injury. Dr. Townsend testified that the degenerative changes in Drummond's neck were not a result of the DART bus incident and were aggravated by the 1999 automobile accident.[34] Dr. Townsend further testified that all treatment of Drummond's neck complaints was a result of the pre-existing degenerative disk disease and not a result of the DART bus incident.[35] Dr. Townsend also testified that the C4 through C7 spinal fusion performed by Dr. Bose was unnecessary because there is no evidence of any nerve root injury which would have required this procedure.[36] Accordingly, Dr. Townsend concludes that there is no medical basis for the spinal fusion and, therefore, the neck surgery should not have been performed at all.[37]

---

28. Dr. Johnson was the orthopedic surgeon who performed the arthroscopy on the knee and treated Drummond from May 2000 until June 2003. Drummond began treatment with Dr. Leitman for his shoulder complaints in March 2003 shortly after his release from prison. As noted by Dr. Leitman, Drummond's incarceration prevented him from receiving treatment for a non-union of a left proximal humerus fracture. From the time of the fall in December 2001 until the shoulder surgery in April 2003, Drummond suffered from persistent pain and limited range of motion in his left arm from the unhealed shoulder fracture.

29. D.I. 77 at 34–45.

30. Id. The April surgery also involved insertion of a bone graft, taken from his ileac crest (hip area) and placed in the non-union of the humerus. According to Dr. Leitman, the graft from the hip would cause pain during recovery.

31. Trial Transcript at 54–62.

32. Id. at 46.

33. Id. at 20.

34. Id. at 47.

35. Id. at 73–76.

36. Id. at 47.

37. Id. at 42–43.

Dr. Townsend, however, concedes that Drummond's neck pain is not completely unrelated to the DART bus incident.[38] Since the neck problems were pre-existing and unrelated to the DART bus incident and the fusion surgery was contraindicated, the government contends that all costs related to the spinal fusion are not recoverable.

Drummond admits to pre-existing neck complaints, but maintains that they were asymptomatic at the time of the DART bus incident. Drummond contends that this incident aggravated an asymptomatic condition, which required further treatment, including surgery. In support of Drummond's position, Dr. Gold testified that the degenerative changes in Drummond's neck were asymptomatic at the time of the bus incident.[39] Dr. Gold testified further that the neck injury was casually related to the DART bus incident.[40] Dr. Bose testified that the disk disease was asymptomatic at the time of the DART bus incident and as a result of the DART bus incident, Drummond developed radiculopathy.[41] Dr. Bose also testified that Drummond only began to experience neck pain with radiation after the DART bus incident.[42] According to Bose, when the neck condition did not respond to conservative treatment, surgery was then needed to address the neck problem.[43] The surgery, a C4 through C7 fusion, required the removal of disks that were impinging on the spinal cord and inserting a bone graft from a cadaver with hardware, which included a plate and screws.[44] Dr. Bose testified that this surgery was directly related to the DART bus incident.

Assuming *arguendo* that the neck fusion operation was unnecessary, under the Restatement Second of Torts § 457, the government remains liable. The Restatement Second of Torts § 457 provides: "[i]f the negligent actor is liable for another's bodily harm, he is *also subject* to liability for any additional bodily harm resulting from the normal efforts of third persons in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are done in a proper or a negligent manner." [45] (emphasis added). Pursuant to the Restatement, a negligent intervening act of a third party is not a superceding cause if the intervening act is reasonably foreseeable or a normal response to the situation created by the actor.[46] Delaware law provides that "if the subsequent tortious conduct of the third party was reasonably foreseeable, the foreseeable conduct is not a superceding cause and defendant is not relieved of liability." [47] In the present matter, Drummond sustained injuries, which required medical care. Thus, any subsequent medical treatment, whether or not properly administered,

---

38. *Id.* at 73.

39. D.I. 79 at 32.

40. *Id.* at 32–33.

41. D.I. 78 at 15 and 44.

42. *Id.* at 20. Dr. Acini treated Drummond for neck pain resulting from the automobile accident on June 8, 1999. The complaints of neck pain and any resulting treatment ended by June 29, 1999.

43. *Id.* at 35. The cervical fusion procedure was performed on February 18, 2004.

44. *Id.* at 36–37.

45. Restatement (Second) of Torts § 457 (1965).

46. *See* Restatement (First) of Torts § 447 (1934).

47. *Nutt v. GAF Corp.*, 526 A.2d 564, 567 (Del.Super.1987). In reaching its decision, the Superior Court in *Nutt* specifically relied on a prior Delaware Supreme Court decision which cited with approval the Restatement of Torts. *See id.* at 567, 567 n. 2.

arose from the DART bus incident and therefore, is reasonably foreseeable. As between plaintiffs and defendant in this matter, whether the fusion procedure was medically necessary is irrelevant, and the government is not relieved from liability on this basis.

After considering the medical and expert evidence, the court finds that Drummond had an asymptomatic, pre-existing degenerative condition in his neck which was aggravated by the DART bus incident. As a result of this incident, this condition became symptomatic as evidenced by neck pain and radiculopathy, which, in turn, lead to the fusion surgery being performed.

■■■ As a result, the court finds that the injuries and subsequent surgeries to Drummond's knee, neck and shoulder are directly related to the DART bus incident, and therefore, plaintiffs are entitled to recover from the government the outstanding past medical expenses related to these injuries in the amount of $38,918.74. In addition, should plaintiffs be required to reimburse Medicaid for any medical expenses incurred up to the time of trial for injuries to Drummond's knee, neck and shoulder arising from the DART bus incident, plaintiffs are also entitled to recover that amount from the government.[48]

## 2. Future Medical Expenses

■■■ Drummond contends that as a result of the injuries sustained in the DART bus incident he will require future surgery on his shoulder. Drummond's present shoulder problems are due to loosened hardware which require surgical removal. Drummond's treating physicians, in particular Dr. Leitman, conclude that future shoulder surgery is needed to alleviate pain,[49] a fact that the government does not dispute.[50] Dr. Leitman testified that this surgery will cost approximately $5,000.00.[51]

The government's argument, as noted previously, is that any shoulder problem is the result of a fall, unrelated to the DART bus incident and, therefore, any future shoulder surgery to remove the remaining hardware is not causally connected to the DART bus incident. Since the court previously determined that the shoulder injury was directly caused by other conditions arising from the DART bus incident, it naturally follows that the proposed future surgery is also related. Therefore, the future shoulder surgery is a result of the DART bus incident for which Drummond is entitled to compensation in the amount of $5,000.00.

## 3. Pain and Suffering

■■■ Drummond seeks compensation for past, present and future pain and suf-

---

**48.** The documentary evidence, specifically JX 24, shows that there are $38,918.74 of outstanding medical expenses. The same exhibit also reflects that $31,124.31 was paid by Medicaid. According to Tammi Drummond's estimation, approximately $70,000 in medical expenses is owed by her and her husband for treatment of his injuries from the DART bus incident. Plaintiffs' counsel also argued that approximately $70,000 in medical expenses was owed by plaintiffs. Since the basis for counsel's and Mrs. Drummond's estimate of past medical costs is not clear, the court assumes that the $70,000 estimate includes the obligation of plaintiffs to reimbursement Med-

icaid for any payments made for Drummond's medical treatment. The court also relies on simple arithmetic for this assumption ($38,918.74 + $31,124.31 = $70,043.05.)

**49.** D.I. 77 at 53.

**50.** The government's sole argument was that the shoulder injury was due to a fall and not the DART bus incident. It did not dispute Drummond's problems with the remaining hardware, the medical need to remove it or the related costs for removal.

**51.** D.I. 77 at 53.

fering for his knee, neck and shoulder injuries sustained in the DART bus incident. As described previously, Drummond suffered serious injuries to his knee, neck and shoulder as a result of the DART bus incident. He has undergone numerous, painful surgeries, which have entailed long recovery periods and rigorous rehabilitation. Drummond still experiences pain from the donor site on his hip, in his neck, and in his shoulder. As a result, he has limitation of motion of his arm and neck. Except for the shoulder injury and the dispute regarding the appropriateness of the neck procedure, the medical testimony from both sides confirms Drummond's other injuries and that they are related to the DART bus incident.

Because of the surgeries, Drummond has scarring of his neck, shoulder and hip. He claims that he has difficulty standing for extended periods of time because of his knee injury. He will have to undergo future surgery to remove the hardware in his shoulder.

The court has considered the effect that the various injuries have had and will have on his life. His daily activities, including work, are limited due to pain. Drummond claims that he is only able to work one to two hours a day rather than the sixty to eighty hours per week that he worked before the DART bus incident.[52] According to Drummond, the injuries have affected his family life. He can no longer engage in the recreational activities with his family that he enjoyed before the DART bus incident, such as, going to the beach or amusement parks, riding on roller coasters and bowling.[53] Moreover, his intimate relationship with his wife has been effected by the DART bus incident.[54] Since then, he has trouble sleeping[55] and suffers from a severe loss of appetite.[56] He is frequently irritable, impatient and short tempered.[57] After careful consideration of the evidence, the court concludes that Drummond should be compensated in the amount of $235,000.00 for his pain and suffering.

### 4. Loss of Consortium

■ Tammi Drummond, seeks compensation for loss of consortium. According to Mrs. Drummond, before the DART bus incident her husband helped out around the house with daily chores, yard work, minor home repairs, and general maintenance. He was involved in family activities, such as vacationing and bowling. Since the DART bus incident, his household assistance and his involvement in any family activities are limited. Mrs. Drummond describes her husband as often tired and in pain, and because of fatigue and pain, he is unable to spend quality time with her or their children.

The government contends that Tammi Drummond's loss of consortium is due to her husband's incarceration and the couple's separate residences, rather than the DART bus incident. Drummond was imprisoned for approximately nine months in

52. Trial Transcript at 116–117. Drummond further testified that he is unable to perform tasks at work, such as lifting sheets of drywall, buckets filled with mud or heavy materials over his head.

53. *Id.* at 118–19.

54. *Id.* at 120–21.

55. *Id.* at 121. Drummond stated that he is up every hour tossing and turning, and he has to constantly reposition himself to relieve neck pain.

56. *Id.* at 125.

57. *Id.* at 122–23.

2002. The government also points out that Mrs. Drummond and her husband live in separate households. According to the evidence, Drummond lives with his mother in Lewes, Delaware, while Tammi Drummond remains in their home with their children in Wilmington, Delaware. Tammi Drummond testified that the separate living arrangement began after her husband's release from prison in 2002.[58] She does, however, keep clothing at her mother's-in-law home and stays there three to four days a week.[59] Both the period of incarceration and the separate living arrangement significantly affect the loss of consortium claim.

After consideration of the evidence, the court finds that $10,000.00 is reasonable compensation for Tammi Drummond's loss of consortium claim.

**CONCLUSION**

As a result of the findings contained herein, the court finds plaintiffs are entitled to a total award of damages in the amount of $288,918.74, plus any amount they (jointly or separately) must reimburse Medicaid for medical expenses incurred up to trial that are related to the DART bus incident. A final judgment order consistent with this opinion shall be entered.

**58.** Trial Transcript at 188. **59.** *Id.*