Patrick BARRON, Plaintiff,

v.

UNITED STATES of America, Defendant and Third-Party Plaintiff,

v.

MAITLAND BROS. CO., a corporation, Third-Party Defendant.

No. 76–0450.

United States District Court, D. Hawaii.

June 29, 1979.

Paul F. Cronin, Gerald Y. Sekiya, Honolulu, Hawaii, for plaintiff.

Elliot Enoki, Asst. U. S. Atty., Honolulu, Hawaii, for defendant and third-party plaintiff.

John R. Lacy, Honolulu, Hawaii, for third-party defendant.

## MEMORANDUM OF OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

SCHWARZER, District Judge.

Patrick W. Barron brings this action against the United States ·pursuant to the Federal Tort Claims Act (28 U.S.C. §§ 1346(b) and 2671 et seq.) The liability and damage issues were bifurcated and the former were tried to the Court on May 21–23, 1979.

### I. *The Facts*

On June 28, 1976, while employed as a laborer by Maitland Bros. Co., a contractor, Barron sustained serious injuries when a deep trench in which he was working collapsed and partially buried him. In this action he seeks damages from the government for his injuries, alleging that they were proximately caused by the concurrent negligence of the government and the contractor.

Maitland was engaged in the construction of a network of sewer pipes at the Pearl

Harbor Naval Shipyard, the so-called ship waste water collection ashore facility. The work was covered by a contract, dated May 19, 1975, specifying a total price of $4,888,-000. (Ex. 3)

The accident occurred in a trench, identified as the DE trench, between 8 and 10 feet in depth. The trench was located near the waterfront in loose, unconsolidated soil, consisting mostly of sand and silt and subject to tidal action which caused it to be flooded regularly. It was one of a network of trenches which was to hold sewer pipes to carry waste water from ships' piers to central disposal facilities.

Excavation of the DE line was begun on Wednesday, June 3, 1976, by a crew of about four workers including Barron. The work was from time to time observed by John P. Flynn, the Navy's contract representative for this project. Flynn had the responsibility of observing Maitland's performance of the contract, advising its supervisory personnel of noncompliance with the contract, including safety violations, and rendering regular reports on the contractor's performance to his superiors. Flynn also had authority, when it appeared that the contractor was creating imminent danger to personnel, to order the particular work stopped until the condition was remedied. Inasmuch as the trench was being excavated to a depth in excess of four feet in unconsolidated soil, Flynn told the crew, on several occasions, that shoring of the trench or equivalent protection was required by the contract before personnel could enter the ditch. (Ex. 17)

Excavation of the DE line trench continued on Thursday, June 24 and Friday, June 25. (Exs. 18–19) As the excavation progressed from the starting point, sections of pipe were laid and covered with gravel-type material and the finished portions of the line backfilled. Although the excavation for the most part was done by machine, personnel had to enter the ditch to assist with excavating and dewatering and to place and join the pipe sections.

Shoring consisting of large pieces of plywood braced with hydraulic jacks was in-stalled as the excavation progressed on Thursday and Friday. Shoring is normally placed from the top, generally after a section of trench has been excavated and before personnel enters the ditch. Once pipe has been laid and connected in a portion of trench, the shoring is removed and that section filled while work progresses in the next portion.

At about 6:30 a. m. on Monday, June 28, the day of the accident, Flynn drove past the trench on the way to his office. Work had not yet begun that day and he made only a cursory observation. He saw no shoring installed in the portion of the trench then open but he observed shoring materials stacked at the site.

Excavation of the DE trench resumed later that morning. The trench had been nearly filled with water earlier that day and had to be dewatered before excavation resumed. (Ex. 21) No additional shoring was installed in the excavation made that day. Plaintiff entered the trench to move the dewatering pump clearing the way for the backhoe to dig. As plaintiff lifted the pump by its handles, the side of the trench broke off and partially buried him.

## II. The Government's Negligence

### A. The Relevant Facts

Section 12 of the General Provisions of the contract between Maitland and the Navy required the contractor to

> "take proper safety . . . precautions to protect the work, the workers, the public and the property of other." (Ex. 3, p. 3)

The specifications accompanying the contract required among other things that

> "Shoring and bracing shall be installed whenever personnel enter trenches greater than four feet in depth in other than hard material." (Ex. 4, Sec. 2B § 4.1)

The specifications also incorporated by reference the General Safety Requirements Manual of the U.S. Army Corps of Engineers (EM 385–1–1, 27 Mar. 1972) which in relevant part provides:

"23.A.01. The sides of excavations 4 feet or more in depth unless in solid rock, hard shale, or cemented sand and gravel shall either be sloped to the angle of repose or be supported by sheeting . . . shoring, or other support system." (Ex. 5, p. 89)

Further it provides specifically:

"23.B.01. The sides of trenches 4 feet or more in depth entered by personnel shall be supported or sloped to the angle of repose. Where material is unstable and dangerous . . . vertical or near vertical sides of any depth shall be supported." (Ex. 5, p. 93)

The record establishes a general and continuous disregard of these requirements by the contractor. The Navy was aware of the contractor's violations and considered them to be serious but took no remedial action other than to issue periodic warnings as demonstrated by the following summary of the relevant contemporary documents.

The Navy's problems with the contractor's safety practices began in September 1975, within a month of commencement of the work, when a powerline collapsed in the course of an excavation. As a result, the Navy's resident officer in charge of construction (ROICC) warned Maitland that

"Any further failures on your part to comply with directions given by government representatives will not be tolerated and may in fact lead to a full suspension of work or recommendation to terminate the contract." (Ex. 31)

Beginning in November the Construction Representative's Reports prepared by Mr. Flynn reflect repeated failures to provide adequate shoring of trenches, or any shoring at all. (Exs. 38(h), 38(g), 38(f)) Two notices of violation were issued based on the presence of workers in unshored trenches. (Exs. 64, 63) Following these notices, on November 20, the ROICC wrote Maitland itemizing some of "the many major discrepancies which have occurred to date," including the following:

"h. Government construction representative has had to stop work in several instances due to safety violations such as lack of trench shoring . . . ."

The officer declared himself as "extremely dissatisfied with the performance of your CQC [Contractor's Quality Control] organization to date" and requested that immediate steps be taken to remedy the deficiencies. (Ex. 28)

Nevertheless, within the next two weeks Flynn observed continued failures to shore and issued a violation notice for having workers in an unshored trench. (Exs. 38(d), 38(e), 38(c)). On December 8, the ROICC informed Maitland of its "non-compliance with the contract requirements in the following areas of work . . . ."

"a. Shore trenches greater than four feet in depth in other than hard material."

Maitland was advised that "Until the non-compliant work is corrected no payment will be made for work not meeting the contract requirements." (Ex. 48) The record does not reflect, however, that any payment was ever withheld. Within the next three weeks, the ROICC directed two additional letters to Maitland confirming advice that the shoring requirements under the contract must be complied with and stating that "the Officer in Charge will not allow contractor's workmen to enter the excavation until such certified shoring drawings are approved and submitted." (Ex. 52, 29)

In February 1976, responding to a request from the insurance company which apparently had issued Maitland's performance bond under the contract, the Navy advised that with respect to safety, performance had been

"Poor. Contractor personnel are frequently found working without hard hats, in unshored trenches, without goggles when cutting or grinding, etc." (Ex. 45)

In March, Maitland was cited for what the ROICC described as "flagrant violation of safety and fire regulations," unrelated to shoring. (Ex. 44) A few days later, the ROICC stated that he had noted no corrective action having been taken and added:

"You are reminded that the Commanding Officer, Naval Supply Center, Pearl Har-

bor has the prerogative of denying your continued use of this area should these unsafe conditions persist." (Ex. 43)

And later in March, in a letter complaining of Maitland's continuing failure to place barriers around excavations, ROICC specifically referred to its power to have necessary safety measures performed by others at the contractor's cost:

"These excavations represent a grave threat which will no longer be tolerated. You are hereby notified that unless you have taken action to provide a safe barrier as called for under the contract specifications not later than noon on Thursday, 25 March 1976, ROICC PEARL will issue a service request to have the fences constructed by Government forces. The cost of this work will then be deducted from payments due under the contract." (Ex. 42)

The record does not indicate, however, that such action was ever taken.

Between March 30 and April 17, Flynn's Construction Representative's Reports noted that he had observed trenches with inadequate or no shoring on at least eight occasions. (Exs. 38(a), 38(n), 38(m), 38(l), 38(k), 38(j), 38(i), 38(o)) He issued three notices of violation for having workers in unshored trenches. (Exs. 62, 61, 60) In his April 17 report, Flynn stated:

"Contractor's disregard for the safety of his employees, by allowing them to take calculated risks of being caught in a cave-in, should be reported to 'OSHA', as noncompliance notices for safety violations, do not have any impact what-so-ever. HAVFAC Spec. No. 14–73–0730; Section 2S, Paragraph 4, states, 'It shall be the contractor's responsibility to comply with OSHA.' This requirement is totally ignored when shoring of the trench is a prerequisite for safety of the workers. It is not feasible to have a government inspector at the immediate site, where shor-

ing is needed, at all times, if no inspector is at site, contractor will allow men to enter trench/s, until inspector arrives and stops the operation, due to the unsafe condition of area where men are working. Undersigned's filed reports can verify number of times that contractor was ordered to stop work, due to unsafe conditions in trenches, but the practice still continues, contractor's supervision/supervisors will continue to place workmen in unsafe trenches, unless a government inspector is on hand to stop them. (Ex. 38(o))

On June 28, plaintiff was severely injured when an unshored trench collapsed on him.

**B. The Government's Duty to Plaintiff**

The Federal Tort Claims Act imposes liability on the government only where "a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Thus the issue is whether, and to what extent, a person who hired an independent contractor would be liable for injuries suffered by the contractor's employee under Hawaiian law.

There are no reported Hawaii decisions squarely on point. However, in *Michel v. Valdastri, Ltd.,* 59 Haw. 53, 575 P.2d 1299 (1978), the Hawaii Supreme Court held that "the duty of the employer to provide a safe place to work runs to whomever he requires or permits to perform work on his premises." There an employee of an independent contractor was permitted to recover from a property owner on a negligence theory based on the owner's safety code violations.[1] While *Michel* is not directly on point inasmuch as it involved an owner-employer's breach of duties imposed by statute, it strongly indicates that Hawaii would follow those jurisdictions which have imposed liability on an owner for permitting his contractor to conduct extra hazardous activities without taking proper precautions.

---

1. The government points to the exception to landowners' liability where the employee's injury is caused by the dangerous condition which he was hired to repair. *See, Michel v. Valdastri, supra,* 59 Haw. 53, 575 P.2d 1299. That exception does not apply, however, to an employee of a contractor hired to dig trenches and lay sewer pipes who is injured due to the failure to observe safety requirements.

The existence of such liability is well established in California. *Van Arsdale v. Hollinger,* 68 Cal.2d 245, 66 Cal.Rptr. 20, 437 P.2d 508 (1968).[2] The Ninth Circuit recently held that Nevada, although its courts had not spoken, would impose a similar duty. *McGarry v. United States,* 549 F.2d 587 (9th Cir. 1976), *cert. denied,* 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977). The Court concludes that Hawaii would adopt the same rule.

The hazardous nature of plaintiff's work in the trench does not appear to be disputed. The contract documents require categorically that all ditches more than four feet in depth in unconsolidated soil—and all such ditches regardless of the soil material if entered by personnel—must be shored. The existence of that requirement alone compels a finding that work inside deep ditches is extra hazardous in the absence of special precautions.

That finding is also supported by evidence that the risk of instability of the unconsolidated soil in the project area, aggravated as it was by the tidal action upon the soil, was obvious and well known to the responsible personnel on the project, including the Navy personnel.

## C. *The Government's Breach of Its Duty*

■ Under its contract the Navy reserved general direction of the work:

"The work will be conducted under the general direction of the Contracting Officer and is subject to inspection by his appointed inspectors to insure strict compliance with the terms of the contract." (Ex. 3, para. 42)

The contract further provided:

"The Contracting Officer will notify the Contractor of any noncompliance with the foregoing provisions and the action to be taken. The Contractor shall, after receipt of such notice, immediately take corrective action. Such notice, when delivered to the Contractor or his representative at the site of the work, shall be deemed sufficient for the purpose. If the Contractor fails or refuses to comply promptly, the Contracting Officer may issue an order stopping all or part of the work until satisfactory corrective action has been taken. No part of the time lost due to any such stop orders shall be made the subject of claim for extension of time or for excess costs or damages by the Contractor. (Ex. 3, para. 41(c))

The work was being performed at the Pearl Harbor Navy Shipyard, *i.e.,* on government property, and in close coordination with the representative of the Naval Facilities Engineering Command at Pearl Harbor, the officer in charge of construction for the Mid-Pacific (OICC), and the resident officer in charge of construction

---

**2.** The *Van Arsdale* case cited section 416 of Restatement Second of Torts as support for its imposition of a nondelegable duty on the employer of an independent contractor hired to perform extra dangerous work. Defendant correctly points out that the Restatement characterizes § 416 as imposing vicarious liability on the employer for the acts of the independent contractor. The United States has not waived its sovereign immunity except as to claims based on "the negligent or wrongful act or omission of any employee of the Government." 28 U.S.C. § 1346(b). The Act specifically provides that independent contractors are not employees of the government. 28 U.S.C. § 2671. This language has been interpreted to bar claims seeking to impose vicarious liability on the United States for the acts of its independent contractors. *See Logue v. United States,* 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973).

There is language in the *Van Arsdale* opinion which supports a vicarious liability characterization, while there is other language which suggests that the employer is liable only for his failure to carry out the duties imposed on him. The Ninth Circuit, in holding that the United States could be found liable under the FTCA on the basis of the California decision in *Van Arsdale,* focused on the language requiring negligence by the employer to show a breach of this nondelegable duty. *Thorne v. United States,* 479 F.2d 804 (9th Cir. 1973). The Court there explicitly recognized that vicarious liability could not be imposed on the United States and so construed the California case. *See also United States v. Babbs,* 483 F.2d 308 (9th Cir. 1973). Similarly, this Court will base its decision on whatever duty Hawaii would impose independent of any theory of vicarious liability.

(ROICC) under him. The ROICC had one civilian and four military assistants who in turn had under them construction management engineers one of whom (Lawrence Uyehara) was assigned to this project and had as his contract representative Mr. Flynn, an experienced and conscientious inspector. In addition the OICC was assisted by a staff which included a safety officer (Wallace Wasada).

Thus the Navy had a substantial organization in place to administer this contract and to insure compliance by the contractor, and its personnel were actively engaged in these tasks.

The record shows that the government personnel responsible for this project—from the ROICC down to Mr. Flynn—had reached the conclusion shortly after work began that the contractor's performance of its safety obligations under the contract, particularly relating to shoring, was grossly deficient and could be treated as a breach of the contract. (See pp. 1080–1082 above) The evidence of further violations and of a general disregard by the contractor of its safety obligations continued to accumulate through April 1976. Nothing ever occurred which should have led the Navy to change this conclusion.

Not only was the Navy well aware for months of the unreasonable risks which the contractor was continuously creating, but it also was aware of the various alternatives open to it to deal with the situation. As its letters showed, it knew that if warnings failed to bring about a correction, it could withhold payments, cause the necessary safety measures to be performed by others and charge the contractor, suspend or stop all or part of the work, bar the contractor from the base or terminate the contract. Although continuously threatening the contractor, the Navy did none of these things, instead allowing work to proceed for months in a manner which it knew exposed the contractor's personnel to unreasonable risks of injury from cave-ins.

Under the contract, the primary duty to provide for the safety of the workers rested of course on the contractor. The Navy had no obligation to police the contractor's activities, direct it in the execution of the contract or stop the work whenever a violation was observed.

But here the Navy reserved general control of the work. It had a substantial professional staff to oversee it. It knew that over a period of some nine months, the contractor had flagrantly disregarded major safety requirements under the contract and was continuously placing the lives of its workers in great jeopardy. It knew that work such as laying pipe in deep trenches was an extra hazardous activity when not conducted in conformity with safety requirements.

On the basis of these facts, the court finds and concludes that the Navy was negligent in failing to take steps beyond issuing warnings to enforce compliance with the safety requirements of the contract.[3]

### III. *Contributory Negligence*

At the time of the accident, Barron was 27 years old. He had graduated from college in Hawaii in 1971 with plans to become a teacher. However, for the five years preceding the accident he had held various jobs as laborer and equipment operator in the construction industry.

He went to work for Maitland about nine months before the accident. Until a week before the accident he worked on a different project in the Pearl Harbor area which did not involve deep excavations.

He was assigned to the ship waste water project about a week before the accident and worked on the DE trench from the start of the excavation. He heard Flynn tell Avilla, the senior member of the crew, to install shoring and he helped install some

---

**3.** The government seeks to invoke the exception under the Tort Claims Act for discretionary functions. 28 U.S.C. § 2680(a). However, the decisions have limited the application of that exception to decisions made in the course of planning rather than operational activities. *Driscoll v. United States*, 525 F.2d 136, 138 (9th Cir. 1975). The Navy's failure to take action where action was clearly mandated by the interests of safety was operational.

on Thursday and Friday. He also helped obtain some rabbit boxes which were used for a time in the ditch to protect the personnel. On Friday and again on Monday morning he observed some small sloughs on the side of the trench. He also saw water in the trench on Saturday and again on Monday.

Prior to the accident he had never worked in trenches more than four feet deep or, except for one day, in other deep excavations. He had never before worked around shoring. He received neither instructions nor warnings concerning safety procedures for working in deep trenches from Maitland or anyone else.

At the time of the accident Barron was engaged in the work assigned to him. He was performing his duties properly and safely. Nevertheless the government contends that he was contributorily negligent.

To charge plaintiff with contributory negligence here, the Court would have to find that plaintiff knew or should have known that by entering a trench without shoring or other protection he exposed himself to an unreasonable risk of harm. *F. Koehnen, Ltd. v. City and County of Honolulu*, 47 Haw. 329, 388 P.2d 214 (1963). Although the Court finds that the Navy was negligent in failing to take active measures to enforce the shoring requirements of the contract here, the record does not sustain an inference that Barron himself was on notice of the danger to which his presence in the trench exposed him. While Barron knew that shoring was to be installed and helped install some, and had observed minor indications of instability, he had had neither experience nor instruction to warn him of the extent of the danger.

■ In the situation presented by this case, where the contractor negligently fails to provide the required protection to employees assigned to carry on hazardous duties, it would hardly be appropriate to charge the employee with some of the fault in the absence of evidence which at least shows that he knowingly and deliberately exposed himself to the risk. There being no such evidence here, the defense of contributory negligence must be rejected.

## IV. The Third Party Complaint Against Maitland

■ Having found the government negligent, the Court must now confront the problems involved in allowing recovery by plaintiff. Plaintiff has heretofore received and continues to receive workers compensation benefits from Maitland. Under Hawaii law, this is his exclusive remedy against his employer and any action by Barron against Maitland would be barred under HRS § 386–5.[4]

Nevertheless, it is clear that a contributing cause of plaintiff's injuries was the failure of Maitland to shore the ditch in which he was working. Were Barron free to maintain a tort action against Maitland, the Court would have to find the latter negligent as well. Thus if plaintiff were permitted to recover the full amount of his damages in this action, the government would be held liable for damages which in substantial part were caused not by it but by the contractor. Anticipating that result, the government filed a third-party complaint against Maitland for indemnity or contribution. Maitland moved to dismiss this complaint.

The contract between the Navy and Maitland provides that the contractor "shall be responsible for all damages to persons or property that occur as a result of his fault." (Ex. 3) A substantially similar clause was interpreted by the Supreme Court as giving the government a right to recover for loss to it caused by the contractor. *United States v. Seckinger*, 397 U.S. 203, 90 S.Ct.

---

4. Sec. 386–5 provides:

 § 386–5 Exclusiveness of right to compensation. The rights and remedies herein granted to an employee or his dependents on account of a work injury suffered by him shall exclude all other liability of the employ-er to the employee, his legal representative, spouse, dependents, next of kin, or anyone else entitled to recover damages from the employer, at common law or otherwise, on account of the injury.

880, 25 L.Ed.2d 224 (1970).[5] In that case, the government had in a prior action been held liable for the full amount of damages suffered by its contractor's employee. It then brought an action against its contractor for indemnity under its contract in a different jurisdiction. In a four to three decision, the Court construed the contract language as entitling the government to recover in such action but only for loss attributable to the contractor's negligence. The majority opinion stated that without more specific language, the contract did not entitle the government to be indemnified for its own negligence. And the dissent made it quite clear that the government's recovery under the contract was in the nature of contribution, not indemnity. (397 U.S. at 221, 90 S.Ct. 880.)

*Seckinger* held that the interpretation of the government's contract is a question of federal law. Under federal law, therefore, the government would, as a matter of contract, be entitled to contribution from Maitland to the extent of Maitland's negligence.

■ The plaintiff's right to recover, however, and his right to damages is governed under the Tort Claims Act by the law of the place of the wrong, *i.e.*, Hawaii. 28 U.S.C. § 1346(b); *United States v. English*, 521 F.2d 63, 70 (9th Cir. 1975). Hawaii law makes plaintiff's workers compensation remedy the exclusive remedy against his employer. Implementing this provision, the

Hawaii Supreme Court has held that it bars an action for contribution by a third party tortfeasor against the plaintiff's employer. *Kamali v. Hawaiian Electric Co.*, 54 Haw. 153, 504 P.2d 861 (1972). The court distinguished claims for indemnity on the theory that they arise by contractor, not by reason of the employee's injury.

■ While the government's claim against the contractor here rests in the first instance on the contract, the nature of the claim, under *Seckinger*, is not for indemnity but for contribution.[6] Maitland has not contracted to indemnify the Navy for loss or damage caused by the latter's negligence. The contract merely makes Maitland responsible for loss caused by its own negligence, *i.e.*, a "liability . . . premised on the basis of comparative negligence." (397 U.S. at 215, 90 S.Ct. 880, 887) Thus, if plaintiff were permitted to recover his full damages from the Navy and the latter recovered from Maitland that portion attributable to the latter's fault, the result would be the same as though contribution were allowed among joint tortfeasors, a result barred by *Kamali*.[7]

The obvious purpose of the *Kamali* rule is to implement the policy underlying Hawaii's workers compensation law, a system intended to provide swift, sure and rationally computed compensation for work-incurred injuries. The employer pays benefits according to an established schedule regardless of fault; in return he is relieved

---

**5.** The pertinent language in *Seckinger* reads as follows:

. . . the most reasonable construction of the clause is the alternative suggestion of the Government, that is, that liability be premised on the basis of comparative negligence. . . . this interpretation is consistent with the plain language of the clause, for Seckinger will be required to indemnify the United States to the full extent that its negligence, if any, contributed to the injuries to the employee.

397 U.S. 203, 215, 90 S.Ct. 880, 887, 25 L.Ed.2d 224.

**6.** The holding here should not be interpreted as a refusal to enforce a valid contract. The Court has simply assessed damages in a way that makes this contractual provision moot. The mere existence of such a contract does not mean that the tort damages awarded to a non party to the contract must be structured so as

to give effect to the independent indemnity contract. *But see Rooney v. United States*, 434 F.Supp. 766 (N.D.Cal.1977).

**7.** It is no answer to say that the employer's interests are adequately protected by the lien for the amount of workers compensation benefits on any judgment recovered by plaintiff. While this procedure would allow the employer to recover from plaintiff all or a portion of the benefits paid him, it accomplishes this result only through complicated three-party court proceedings. The purpose of the workers compensation statute is to provide a trade-off of no-fault compensation for the costs and risks of conventional tort litigation. That trade off would be nullified by permitting tort litigation to go forward against the employer by way of a third-party complaint (although otherwise barred).

of the costs and hazards of tort liability. Similarly the employee has traded the up and down-side risks of that liability for the assured benefits of workers compensation. To permit plaintiff to recover his full damages from the Navy, with the Navy in turn recovering contribution from the employer by its third-party complaint would accomplish indirectly what the Hawaii workers compensation law bars parties from doing directly.[8]

The Court therefore concludes that state law precludes plaintiff from recovering from the government the full amount of his damages where a portion of those damages are attributable to the negligence of the employer and would be recoverable by way of contribution from the employer.[9] The same result is mandated by federal law as well. The waiver of sovereign immunity under the Tort Claims Act is limited to liability for "the negligent or wrongful act or omission of any employee of the Government." 28 U.S.C. § 1346(b).

The government, therefore, cannot be held vicariously liable for the negligence of its contractor, even if state law would otherwise permit it. *Logue v. United States*, 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973). The Supreme Court has recently cautioned that "[s]ince the United States can be sued only to the extent that it has waived its immunity, due regard must be given to the exceptions, including the independent contractor exception, to such waiver." *United States v. Orleans*, 425 U.S. 807, 814, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390 (1976) (holding that federal funded community action agencies are not federal agencies for purposes of FTCA liability). An award of full tort damages against the United States, when in fact some of the damages are attributable to the fault of a statutorily immune independent contractor, goes beyond this limited waiver of sovereign immunity.[10]

Recovery by plaintiff of the full amount of his damages in the action against

**8.** *But see Dole v. Dow Chemical Co.*, 30 N.Y.2d 143, 331 N.Y.S. 382, 282 N.E.2d 288 (1972). The New York court there allowed implied indemnity claims to be made against an employer on the basis of comparative fault. The court reached this conclusion by narrowly construing the exclusive remedy provision, holding that it did not bar a separate action by the third party against the employer. This approach, however, completely frustrates the exclusive remedy provision, for the employer is subject to substantial tort-liability even though he has provided no-fault compensation.

**9.** This holding is a narrow one, based on the fact that the contractual provision for contribution involved here would otherwise frustrate the no-fault approach of the workers compensation plan.

The instant situation must be distinguished from cases where either the third party alone was negligent or where it is barred from recovering contribution from the employer. Where the entire fault is attributable to the third party—and no risk exists of recovery from the employer—there is of course no reason to prevent full recovery by the employee. But where both the third party and the employer are at fault, but the former is barred from contribution as under *Kamali*, to permit full recovery against that party may still produce inequitable results. Some courts have in such cases permitted the third party to recover contribution from the employer to the extent of workers compensation benefits paid. *Newport Air Park*

*Inc. v. United States*, 293 F.Supp. 809 (D.R.I. 1968), *reversed* 419 F.2d 342 (1st Cir. 1969); *Brown v. Dickey*, 397 Pa. 454, 155 A.2d 836 (1959). The *Kamali* court rejected this approach as requiring legislative change.

Other courts have reduced tort recovery by the amount of compensation benefits received. *Santisteven v. Dow Chemical Company*, 506 F.2d 1216 (9th Cir. 1974) (applying Nevada law); *Witt v. Jackson*, 57 Cal.2d 57, 17 Cal. Rptr. 369, 366 P.2d 641 (1961); *Lovette v. Lloyd*, 236 N.C. 663, 73 S.E.2d 886 (1953). This approach preserves the upper limit on the employer's liability provided by the workers compensation statute and reduces somewhat the burden on the third party tortfeasor, while maintaining a full tort recovery for the plaintiff. It is unnecessary, however, to decide how Hawaii would resolve this problem, for it is not presented here.

**10.** This is not to say that the FTCA should be generally construed to abolish the rule of joint and several liability. The United States will ordinarily be responsible for all damages proximately caused by its negligence. The FTCA, however, explicitly refuses to waive sovereign immunity for claims based on the acts of independent contractors hired by the government. Awarding full damages against the United States when the contractor's active negligence was a major causative factor would achieve indirectly what the statute expressly prohibits. Limiting the recovery to those damages attributable to the fault of the United States better

the government thus would have to rest on one of two theories, either the Navy and Maitland are regarded as joint tortfeasors, with a corresponding right of contribution between them, or the Navy is liable for the acts and omissions of its contractor, with the customary right to indemnity. State law, as heretofore discussed, bars plaintiff from asserting the former theory. Federal law, which permits no action against the government based on vicarious liability, bars the latter. Plaintiff is thus barred from recovering in this action damages attributable to the fault of Maitland. It follows that there would be no basis for recovery by the government against Maitland. The third party complaint must therefore be dismissed.[11]

### V. The Proper Measure of Recovery by Plaintiff

For the reasons heretofore discussed plaintiff is barred from recovering from the government damages attributable to the contractor's negligence. The logical, as well as the fair and reasonable, result is for the Court to determine the percentage of fault attributable to the government and apply the resulting percentage to the damages sustained by plaintiff.

The principle of comparative fault among joint tortfeasors and its use in fixing the amount of contribution is well established.[12] If comparative fault can be determined for purposes of contribution, it can be determined as well to ascertain the proportion of damage to be assessed against one of two tortfeasors where the other has been immunized against liability.[13]

There appear to be no decisions establishing guidelines for the determination of a party's proportion of fault. Several factors suggest themselves: Which party was primarily responsible for taking the

carries out the statutory intent. The omission from the FTCA of a proposed general rule of proportional liability, discussed in *United States v. Yellow Cab Co.*, 340 U.S. 543, fn. 8, 71 S.Ct. 399, 95 L.Ed. 523 (1951), does not foreclose this approach. The limited use of proportionate liability here is necessary to carry out the express statutory direction that the United States not be held responsible for acts of its independent contractors. This express Congressional intent should prevail over inferences from what Congress did not do.

11. It is important to note, however, that Maitland's motion to dismiss the third party complaint was accompanied by a waiver by Maitland's compensation carrier of its lien against any judgment recovered by Barron in this action with respect to all past and future compensation benefits paid on account of the injury at issue here. In the absence of such a waiver, the potential of inequity exists should plaintiff be barred from recovering for the negligence of his employer while his employer's compensation carrier could recover benefits paid out of the judgment rendered against a third party for the latter's fault. Such a result would be acceptable only where the employer himself was blameless and all fault is properly attributable to the third party. But where the employer bears a substantial portion of the responsibility, it would seem incumbent on courts to fashion a remedy appropriate for the case which would avoid shifting the cost of the benefits provided by the employer to the employee by way of a judgment lien.

California has sought to deal with this problem by denying a negligent employer his right to reimbursement. *Witt v. Jackson*, 57 Cal.2d 57, 17 Cal.Rptr. 369, 366 P.2d 641 (1961).

Fortunately it is not necessary in this action to come to grips with this problem in view of the carrier's waiver of its lien. But it is obvious that this is a problem requiring legislative attention.

12. Hawaii has adopted the Uniform Contribution among Tortfeasors Act which provides:

When there is such a disproportion of fault among joint tortfeasors as to render inequitable an equal distribution among them of the common liability by contribution, the relative degrees of fault of the joint tortfeasors shall be considered in determining their pro rata shares, subject to section 663–17.
H.R.S. § 663–12
Hawaii has also abolished the defense of contributory negligence and adopted a comparative negligence system when the plaintiff is also at fault. H.R.S. § 663–31

13. Compare *Sugue v. F.L. Smithe Machine Co. Inc.*, 56 Haw. 598, 546 P.2d 527 (1976), which by implication accepts the principle of comparative fault in this situation but rejected an attempt to impose proportionate liability on an employer who was not a party. Inasmuch as this Court holds that no liability can be imposed on Maitland, *Sugue* would not preclude a determination of the proportion of fault attributable to the Navy.

necessary precautions; which party was in the better position to prevent the injury; which party was the more active participant in the course of conduct leading to the injury.

In this case it is clear that the responsibility to insure the safety of its employees was primarily Maitland's. It was Maitland's failure to install shoring which caused the injury, and Maitland was by far in a better position to have prevented the injury.

But the Navy's long continued failure to take action to assure compliance by Maitland when it knew that without such action Maitland would not comply places on it a not insignificant share of the responsibility. On the basis of all the facts, the Court determines that 25 percent of the fault must be assigned to the Navy. Following the determination in the damage phase of the trial of the full loss and damage proximately sustained by plaintiff on account of the accident of June 28, 1976, 25 percent of that amount will be assessed against the government.

IT IS SO ORDERED.