Grayce A. HESS and Sidney W. Hess, her husband, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 86-223-JLL.

United States District Court, D. Delaware.

Aug. 12, 1987.

---

Frederick T. Haase, Jr., of Roeberg, Haase & Associates, P.A., Wilmington, Del., for plaintiffs.

Sue L. Robinson, Asst. U.S. Atty., Wilmington, Del., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LATCHUM, Senior District Judge.

This civil action arises out of a "slip and fall" accident which occurred on May 17,

1985, at the Talleyville Branch of the United States Post Office at 3204 Concord Pike, north of Wilmington, Delaware. Plaintiff, Grayce A. Hess ("Mrs. Hess"), seeks the recovery of compensatory damages for bodily injuries sustained in the fall, and plaintiff, Sidney W. Hess, her husband ("Mr. Hess"), seeks to recover damages for the loss of his wife's consortium from the defendant, the United States of America.

The case was tried to the Court without a jury on June 8–9, 1987.

After carefully considering the sufficiency and weight of the testimony adduced at trial, the demeanor of the witnesses who testified, the exhibits admitted into evidence, and the post-trial submissions of the parties, the Court makes the following findings of fact and conclusions of law as required by Rule 52(a), Fed.R.Civ.P.

### FINDINGS OF FACT

1. This is a tort action against the United States arising out of the alleged negligent acts of federal employees committed in the scope of their employment. (Docket Item ["D.I."] 1.)

2. At the time of the accident, Mrs. Hess was a 50–year-old woman, in excellent health, with no physical limitations, injuries or restrictions, and no prior broken bones or slip and fall injuries. (D.I. 52 at A–3, 9, 195; 53 at B–10, 23.) Mrs. Hess was not employed at the time of the accident (D.I. 52 at A–5), but participated regularly in gardening, aerobics, furniture refinishing, and charitable work at the Rockwood Museum. (D.I. 52 at A–6, 162, 168, 170, 177, 181; 53 at B–11, 29, 34, 40.)

3. The United States Postal Service has leased the Talleyville Post Office continually since 1962 and was responsible for the maintenance and repair of that office at the time of the accident. (D.I. 52 at A–112; Plaintiff's Exhibit ["PX"] 29, 30, 31.) The Talleyville Post Office has two sections open to the public: the outer lobby where the post office boxes are located; and the inner lobby where customers transact business with postal employees. (PX 28.) Customers must go through the outer lobby in order to reach the inner lobby. (Id.)

4. Mrs. Hess's accident occurred in the outer lobby. (D.I. 52 at A–19.) The floor in the outer lobby is made of terrazzo which consists of chips of marble in a matrix bed with metal strips closing each adjacent portion. (Id. at A–46.) There are two red mats in the outer lobby which serve as "walk off mats" for customers to walk off any water from their shoes. (Id. at A–131.) These mats are positioned perpendicular to one another to form a right angle extending from the entrance door of the outer lobby to the door leading from the outer lobby to the inner lobby. (PX 28.) The mats do not touch one another. (D.I. 53 at B–69.) There is a 9–1/2 to 10 inch gap between them exposing the terrazzo floor. (Id.; PX 28.)

5. Mrs. Hess's accident occurred on Friday, May 17, 1985. (D.I. 1 at ¶¶ 7–8.) Meteorological records indicate that 2.0 to 2.4 inches of rain fell in the Talleyville area on that date. (PX 15.) As a result, the sidewalk outside the Talleyville Post Office, along with most sidewalks in Talleyville, became quite wet. (Id.)

6. On the day of the accident, Mrs. Hess was extremely busy running errands for the annual Rockwood Museum Ice Cream Festival, for which she was chairperson. (D.I. 52 at A–10.) Mrs. Hess arrived at the Talleyville Post Office around 4:30 p.m., one-half hour before the office closed. (Id. at A–16, 96.) Mrs. Hess parked her car four or five spaces from the Post Office entrance and walked, without an umbrella, to that entrance. (Id. at A–30 to 32.) She was wearing a raincoat, rainhat, slacks, a blouse, and canvas shoes with a low ripply rubber-like sole. (Id. at A–14.)

7. As Mrs. Hess approached the entrance, a young man exiting from the Post Office held the glass double doors open enabling Mrs. Hess to enter the Post Office without stopping to open the doors. (D.I. 52 at A–30 to 31.) Once she entered the Post Office, Mrs. Hess stepped onto the first red mat. (Id. at A–18.) She does not recall looking at the mats but she did remember her foot "going down on a mat." (Id.) Mrs. Hess did not stop to wipe her

feet on this mat but continued to walk at her "normal pace" toward the door leading to the inner lobby. (*Id.* at A–18, 19, 30.) She did not look at the floor as she walked, choosing instead to look straight ahead to the inner lobby doors. (*Id.* at A–39 to 40.) Since she wasn't looking at the floor, Mrs. Hess did not notice the portion of terrazzo floor exposed between the mats. (*Id.* at A–40.)

8. After a few steps, Mrs. Hess turned to her right and proceeded towards the inner lobby door. (D.I. 52 at A–19.) In doing so, Mrs. Hess stepped with her right foot on the portion of terrazzo floor exposed between the mats. (*Id.*) Her foot slid on the moist or wet terrazzo floor causing her to fall. (*Id.*) As a result of that fall Mrs. Hess suffered an impacted fracture of the femoral neck of the right hip. (PX 4.)

9. The mats and the exposed portion of the terrazzo floor were somewhat damp and wet on the day of the accident having been walked on all day by Post Office customers tracking in rainwater from the outside. (D.I. 52 at A–38; 53 at B–53, 84–85.) Mrs. Hess testified that the exposed terrazzo floor was "very wet" covered with "maybe a quarter, maybe an eighth of an inch of rain." (D.I. 52 at A–38.) Mr. George Raibeck, the Talleyville Post Office Station Manager, testified that the floor was only slightly wet, like a smear mark. (D.I. 53 at B–84.) The Court finds Mr. Raibeck's testimony to be more credible since it is difficult to believe that a quarter inch of rain would go unnoticed by all but Mrs. Hess until after she fell.

10. Paul Kutch, the Talleyville Post Office custodian, had mopped the outer lobby's floor on the morning of the accident, but did not mop the outer lobby again that day. (D.I. 52 at A–81.) Raibeck testified that he inspected the floor of the outer lobby approximately every half hour on the date of the accident and decided that the floors were not wet enough to require additional mopping. (D.I. 53 at B–74 to 75.)

11. There were no wet floor signs or similar warnings posted in the outer lobby at the time of the accident. (D.I. 52 at A–87 to 88.) The Talleyville Post Office has such signs but Kutch uses them only when wet-mopping the floors in the morning. (*Id.*)

12. It is common knowledge that terrazzo floors are generally slippery. (D.I. 52 at A–67.) The terrazzo floor in the outer lobby of the Talleyville Post Office has a low static coefficient of friction and is thus slippery even when dry.[1] (*Id.* at A–50 to 57.) Floors that are slippery when dry become even slipperier when wet. (*Id.* at A–57.) This is so regardless of the amount of moisture. (*Id.* at A–67.)

13. The carpets in the outer lobby have been in basically the same configuration since Raibeck began working at the Talleyville Post Office in 1978. (D.I. 53 at B–44 to 45, 79–80.) Neither Raibeck nor Joseph Davis, the Postal Service's Manager of Fleet Operations who investigated the accident, could recall any complaints or prior accidents involving the configuration of the carpets. (D.I. 52 at A–143; 53 at B–45.)

## CONCLUSIONS OF LAW

1. Jurisdiction exists in this case by virtue of the Federal Torts Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680 (1965 & 1976), since this action sounds in tort and is based on the alleged negligent conduct of federal employees acting within the scope of their employment. 28 U.S.C. § 1346(b); *United States v. DeCamp*, 478 F.2d 1188 (9th Cir.), *cert. denied*, 414 U.S. 924, 94 S.Ct. 232, 38 L.Ed.2d 158 (1973). This act also serves as a limited waiver of the United States' sovereign immunity. *United States v. Orleans*, 425 U.S. 807, 813, 96 S.Ct. 1971, 1975, 48 L.Ed.2d 390 (1976).

2. This Court must apply the law of Delaware to the issues in this case because

---

1. The static coefficient of friction is an indication of a floor's slipperiness. (D.I. 53 at A–49.) The American Society for Testing Material promulgates internationally recognized standards for testing the slipperiness of floors under this method. (*Id.*) If the static coefficient is 0.5 or less the Society deems a floor slippery. (*Id.*) The static coefficient of the floor in the outer lobby was 0.41 to 0.43. (*Id.* at A–51.)

the alleged tortious conduct occurred in Delaware. *Toole v. United States,* 588 F.2d 403, 406 (3d Cir.1978).

■ 3. Mrs. Hess was a business invitee of the United States because she entered the Post Office to transact business there, viz. to purchase stamps and mail letters. *DiSabatino Bros. Inc. v. Baio,* 366 A.2d 508, 510 (Del.Supr.1976).

4. It is well settled in Delaware that a possessor of property is not an insurer of his business invitees' safety while the invitee is on the property. *Robelen Piano Co. v. DiFonzo,* 169 A.2d 240, 245 (Del.Supr. 1961); *Niblett v. Pennsylvania R.R.,* 158 A.2d 580, 582 (Del.Supr.1960). Rather, a property possessor's only duty to a business invitee is to exercise reasonable care.

The Delaware Supreme Court has set forth this standard of care as follows: A possessor of property who invites others onto his property to conduct business must exercise due care to keep his property in a reasonably safe condition and warn of any unreasonable risks which he knows about, or with the exercise of reasonable care would have known about, and which the other would not be expected to discover for himself. *DiSabatino,* 366 A.2d at 510; *Hamm v. Ramunno,* 281 A.2d 601, 603 (Del.Supr.1971); *Robelen Piano Co.,* 169 A.2d at 244 (citing the Restatement (Second) of Torts § 343 (1965)).

5. Mrs. Hess contends that this general standard of care gives way to a more specific, higher standard when the place of injury is a store or its equivalent. (D.I. 55 at 5–6.) According to Mrs. Hess, this higher standard, developed by the Delaware Supreme Court in *Robelen Piano* and elaborated on in *Howard v. Food Fair Inc.,* charges a storekeeper with liability for injuries to his invitees caused by an unreasonably dangerous condition on his property of which he had actual knowledge or with the exercise of reasonable care would have had such knowledge. *(Id.)* Noticeably absent from this standard is the requirement that the dangerous condition be latent or not easily discoverable by the invitee. Mrs. Hess argues that the Delaware Supreme Court intentionally eliminat-

ed this requirement in cases involving stores in an effort to impose a higher duty of care upon storekeepers. *(Id.)* The Court disagrees.

6. Mrs. Hess claims that the supreme court developed this standard in *Robelen Piano,* a case involving a slip and fall accident in a piano store, by failing to mention the latency requirement when discussing the piano storeowner's duty of care to his invitees. (D.I. 55 at 5.) Even if Mrs. Hess were correct in her reading of *Robelen Piano,* this Court would be reluctant to recognize the development of a new standard simply because one element of the old standard was omitted from the *Robelen Piano* court's discussion. This practice of creating precedent by omission could prove dangerous in light of the tendency of many courts to state basically the same principle in a variety of ways, sometimes omitting elements that were either not disputed by the parties in a particular case or not essential to that case's resolution. The Court prefers to read as "holding" only that which a court actually held.

But it is not necessary to reject Mrs. Hess's argument on this ground because Mrs. Hess has misread *Robelen Piano.* A cursory reading of that case reveals that the *Robelen Piano* court did recognize the latency requirement. In a paragraph conveniently overlooked by Mrs. Hess, the *Robelen Piano* court held that whether the dangerous condition in that case was discoverable by the invitee was a proper question for the jury. 169 A.2d at 245.

7. Mrs. Hess's reading of *Howard v. Food Fair Inc.,* 7 Storey 471, 201 A.2d 638 (1964), is somewhat more accurate. The *Food Fair* court did omit the latency requirement from its discussion of the duty owed a business invitee. 201 A.2d at 640. Moreover, in discussing the invitee's alleged contributory negligence, the *Food Fair* court seemed to reject that requirement. The court stated: "A customer coming into a store has the right to assume that the floor is suitable and safe to walk upon, and is free from obstacles and defects which might cause a fall." *Id.* at 642. However, this Court is not bound by this

language because *Food Fair* is distinguishable from the case at bar on several grounds.

First, the language quoted above is taken from the portion of the *Food Fair* opinion dealing with the affirmative defense of contributory negligence and not the portion discussing an owner's duty of care. 201 A.2d at 642. Second, *Food Fair* involved a truly latent condition, a grease spill, and there was no reason for the plaintiff in that case to be on the lookout for such a condition. *Id.* at 639. In contrast, the alleged dangerous condition in this case was tracked-in rainwater, a condition for which Mrs. Hess should have been on the lookout since it had rained all day. Finally, and most importantly, the store in *Food Fair* was a supermarket with shelves of food lining every aisle. Cognizant of this, the court reasoned that it would be unfair for a customer to be charged with keeping a watchful eye on the floor when the storekeeper purposely lined the aisles with merchandise in the hope of catching customers' eyes. 201 A.2d at 642. There were no such diversions in this case. By her own testimony, Mrs. Hess was looking straight ahead as she walked and had an unobstructed view. (D.I. 52 at A–39 to 40.)

■ 8. Based on the above, the Court declines to adopt the manufactured "storekeeper standard" offered by Mrs. Hess. Instead, the Court will apply the generally accepted standard set out above in Conclusion of Law 4 which requires proof of (1) an unreasonably dangerous condition, (2) known to the possessor of property or which he would have known if he had exercised due care, and (3) not discoverable by the invitee.

■ 9. Mrs. Hess contends that the evidence produced at trial established these three elements. She insists that the evidence showed the wet terrazzo floor to be an unreasonably dangerous condition of

which the United States knew and which she could not have discovered. (D.I. 55 at 7–17.) The Court will first consider Mrs. Hess's contention that the floor was unreasonably dangerous. There is no dispute that the outer lobby floor was somewhat damp or wet and slippery (D.I. 52 at A–38; 53 at B–84 to 85), and that this wetness probably caused Mrs. Hess to fall.[2] However, this is not enough to show unreasonable dangerousness. Proof of nothing more than the occurrence of a fall is insufficient to show negligence. *Key v. J.C. Penney Co.*, 165 Ga.App. 176, 299 S.E.2d 895, 896 (1983); *Babski v. Niesley*, 207 Pa.Super. 758, 217 A.2d 778, 780 (1966). To hold otherwise would make the United States Mrs. Hess's insurer, compensating her simply because her injuries were sustained on property under its control. This is not the law of this jurisdiction or any other. *Robelen Piano*, 169 A.2d at 245; *Niblett*, 158 A.2d at 582. *See also Rayburn v. J.C. Penney Outlet Store*, 3 Ohio App.3d 463, 445 N.E.2d 1167, 1170 (1982); *Griffin v. Winn Dixie*, 287 So.2d 651, 652 (La.App.1973); *Gulas v. Ratliff*, 283 Ala. 299, 216 So.2d 278, 280 (1968); *Babski*, 207 Pa.Super. 758, 217 A.2d at 779.

■ 10. The United States was not required to use extraordinary care to keep its premises completely dry. The measure of its obligation was only to exercise reasonable care. The Court is convinced by the creditable testimony that the United States fulfilled this obligation. The United States installed "walk off" mats in the outer lobby to keep the floors dry during inclement weather by soaking up water from customers' shoes. (D.I. 53 at B–131.) These mats must have been effective because there was only a light covering of water on the exposed portion of the terrazzo floor at the end of the rainy day of Mrs. Hess's accident. (*Id.* at B–84 to 85.) Moreover, the United States exercised reasonable care

---

**2.** The Court cannot hold with absolute certainty that the wet or moist floor was the sole cause of Mrs. Hess's accident. The soles of Mrs. Hess's shoes were also wet from Mrs. Hess walking in the rain from her car to the Post Office entrance. (D.I. 52 at A–30 to 32.) Thus the accident could have been caused by the slippery condition of Mrs. Hess's shoes, *see Sears Roebuck & Co. v. Johnson*, 91 F.2d 332, 338 (10th Cir.1937), or a combination of the wet floor and her wet shoes. *See Pervel v. Hospital Services Ass'n of New Orleans*, 192 So.2d 852, 855 (La. App.1966).

through its employee, Raibeck, who checked the floor of the outer lobby every ½ hour or so on the day of the accident and determined that the floor was not wet enough to require further mopping or the use of a sign. (*Id.* at B–50 to 52.)

11. There is little else the United States could have reasonably done to protect its customers from the tracked-in water. The United States could not have stopped rainwater from being blown onto its floors by the wind or tracked in by its customers. *See Miller v. Gimbel Bros. Inc.*, 262 N.Y. 107, 186 N.E. 410, 411 (1933). The only way the Court knows for the United States to have kept the lobby floor completely dry is for it to have stationed an employee by the door all day for the sole purpose of mopping up each time a customer entered or left the Post Office. This it was not required to do. *Carlson v. United States*, 90 F.Supp. 159, 160 (N.D.Ill.1950); *Sears Roebuck & Co. v. Johnson*, 91 F.2d 332, 339 (10th Cir.1937); *Kresge Co. v. Fader*, 116 Ohio St. 718, 158 N.E. 174, 176 (1927). It was sufficient for the United States to install walk-off mats, inspect the floor every so often, and mop up the tracked-in water only when it became excessive.

12. Mrs. Hess also contends that the outer lobby was unreasonably dangerous on the day of the accident because there were no signs warning of the slippery condition of the floor. (D.I. 55 at 8.) The Court must reject this argument as well. By all accounts it had rained very hard on the day of the accident. Mrs. Hess's expert estimated that between 2.0 and 2.4 inches of rain fell that day. (PX 16.) Mrs. Hess admits that she was out in the rain on the afternoon of the accident running errands for the Rockwood Museum's ice cream festival. (D.I. 52 at A–10; 53 at B–12.) If the 2.0 to 2.4 inches of rain that fell that day was insufficient to put Mrs. Hess on notice that well traveled entranceways such as the outer lobby of the Talleyville Post Office would be somewhat wet, it is doubtful that a "wet floor" sign would have served that purpose. A sign is of great use when a floor is slippery due to some unexpected or hidden condition, such as a grease spill or a wet-mopping operation. But when an entranceway is wet due to rain, a sign is superfluous, the rainy condition itself should serve as an adequate warning. As stated by the Delaware Superior Court: "If a danger is so apparent the invitee can be expected to notice it and protect against it, the condition itself constitutes adequate warning." *Niblett*, 158 A.2d at 582.

13. Having determined that the floor of the outer lobby was not in an unreasonably dangerous condition, it is unnecessary for the Court to consider whether the United States had knowledge of the condition of the floor or if that condition was easily discoverable by Mrs. Hess. However, as a totally independent and alternative ground for denying the requested relief, the Court finds that the floor's slippery condition was obvious and easily discoverable by Mrs. Hess.

▬ A possessor of property's liability to an invitee for an unreasonably dangerous condition on the property is based on the possessor's superior knowledge, with respect to the invitee, of that condition. *Niblett*, 158 A.2d at 582. It follows that a possessor of property has no duty to warn or make safe an unreasonably dangerous condition obvious to his invitees. *Franklin v. Salminen*, 222 A.2d 261, 262 (Del.Supr. 1966); *Niblett*, 158 A.2d at 582. As stated above, Mrs. Hess was running errands in the rain on the afternoon of the accident. In fact she walked in the rain from her car to the Post Office entrance. (*Id.* at A–30 to 32; 53 at B–12.) Aware of the rain, Mrs. Hess was charged with the knowledge that tracked-in rainwater can accumulate in well traveled entranceways causing a slippery condition. *Key*, 165 Ga.App. 176, 299 S.E.2d at 897; *Robelen Piano*, 169 A.2d at 245. Consequently, even if Mrs. Hess had established that the outer lobby floor was in an unreasonably dangerous condition, her knowledge of that condition would preclude her recovery.[3]

---

3. This discussion sounds similar to a contributory negligence analysis. However it is somewhat different. The Court is discussing an element of Mrs. Hess's prima facie case, that the

14. In a final effort to charge the United States with liability for the accident, Mrs. Hess argues that even if the United States was not under an obligation to keep the outer lobby nonslippery during a rainstorm, it voluntarily attempted to do so by installing the two walk-off mats and was under a duty to install the mats with reasonable care. (D.I. 55 at 18–28.) Mrs. Hess contends that the United States breached this duty by negligently installing the walk-off mats with a 9½ to 10 inch gap of exposed terrazzo floor. (*Id.*) The Court disagrees.

15. Mrs. Hess is correct that a possessor of property must exercise reasonable care when rendering even a voluntary service to his invitees. *Jardel Co. Inc. v. Hughes,* 523 A.2d 518, 564 (Del. Supr.1987). But the United States did exercise such care. The United States installed the two mats as walk-off mats to absorb the water from the soles of its invitees' shoes. (D.I. 52 at A–131.) The mats must have served that purpose effectively because there was only a slight covering of water on the terrazzo floor on the day of the accident. (D.I. 53 at B–84.)

Mrs. Hess insists that the mats were not solely intended as walk-off mats but were also installed to provide a nonslip passageway through the outer lobby as an alternative to the slippery terrazzo floor. (D.I. 55 at 7–8.) For this use, Mrs. Hess contends that the mats were installed negligently because there was a 9½ to 10 inch gap exposing the slippery terrazzo floor which "created a pitfall, an unexpected hazard." (D.I. 55 at 8.) The Court flatly rejects this argument for three reasons.

First, there is absolutely no evidence that the mats were installed for the purpose suggested by Mrs. Hess, to serve as a nonslippery haven from the dangers of the terrazzo floor. The only testimony on this point came from Mr. Davis who stated that the mats were used to absorb water from customers' shoes. (D.I. 52 at A–131.)

Second, even if the mats were installed to provide a nonslippery passageway, they were not unreasonably dangerous for that purpose simply because they exposed a small portion of the terrazzo floor. A terrazzo floor is not in and of itself an unreasonably dangerous condition. *Sheridan v. Horn & Hardart,* 366 Pa. 485, 77 A.2d 362, 363 (1951); *Copelan v. Stanley,* 142 Pa.Super. 603, 17 A.2d 659, 660 (1941).

Finally, the safeness of the mats' configuration is evidenced by the lack of accidents involving the mats. The mats were in basically the same configuration since Raibeck began at the Talleyville Post Office in 1978, and there were no reported accidents during that time involving the configurations of the mats. (D.I. 52 at A–143; 53 at B–45.) Evidence of the lack of prior accidents resulting from an alleged unreasonably dangerous condition may be used to show that the condition is not unreasonably dangerous. *Pippin v. Ranch House South Inc.,* 366 A.2d 1180, 1183 (Del.Supr.1976). The Court finds such evidence persuasive in this case.

16. Given the Court's conclusion that Mrs. Hess has failed to show that the United States breached its duty to maintain the outer lobby of the Talleyville Post Office in a reasonably safe condition, it is unnecessary to consider the United States' affirmative defense that Mrs. Hess was contributorily negligent.

An order will be entered in accordance with these Findings of Fact and Conclusions of Law.

---

defect be latent. A discussion of the affirmative defense of contributory negligence would focus not only on Mrs. Hess's knowledge of the condition, but on the reasonableness of her conduct given that knowledge. As stated in the text, the Court expressly declines to decide whether Mrs. Hess was contributorily negligent at this time.