William P. **DELLINGER**, Jr., Plaintiff,

v.

**UNITED STATES of America**,
Defendant.

Civ. A. No. 86–269–JLL.

United States District Court,
D. Delaware.

Dec. 28, 1987.

Norman C. Barnett, of Schab & Barnett, Georgetown, Del., for plaintiff.

Sue L. Robinson, Asst. U.S. Atty., Wilmington, Del., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LATCHUM, Senior District Judge.

Plaintiff, William P. Dellinger, Jr., initiated this civil action as a result of a "slip and fall" accident which occurred on February 12, 1983, at the United States Post Office located on Causey Avenue in Milford, Delaware. Mr. Dellinger seeks to recover from the defendant, the United States of America, compensatory damages for pain, distress, medical expenses, lost wages, and future medical expenses and lost wages resulting from bodily injuries he suffered in the fall.

The case was tried to the Court without a jury on October 26, 1987.

After carefully considering the sufficiency and weight of the testimony adduced at trial, the demeanor of the witnesses who testified, the exhibits admitted into evidence, and the post-trial submissions of the parties, the Court makes the following findings of fact and conclusions of law as required by Rule 52(a), Fed.R.Civ.P.

## FINDINGS OF FACT

1. This is a tort action against the United States of America alleging negligence by United States Postal Service employees acting within the scope of their employment. (Docket Item ["D.I."] 1.)

2. Mr. Dellinger is employed as a Traffic Manager overseeing shipping operations for Draper–King Cole Company. (D.I. 32 at 9.) At the time of trial, plaintiff was forty-three years old. (*Id.* at 8.)

3. Mr. Dellinger has had a Post Office box for the last twelve years at Milford Post Office. (*Id.* at 52.) He testified that he checked his post office box two to five times a week. (*Id.*) When plaintiff traveled to the Post Office, he almost always drove and parked in the Post Office's parking lot. (*Id.*)

4. The Milford Post Office parking lot is at the side of the building. (Defendant's Exhibit ["DX"] 11.) A sidewalk connects the parking lot and the front door of the Post Office. (*Id.*) There is a slight incline leading from the parking lot to the sidewalk. (DX 7–8.)

5. The Post Office was providing twenty-four hour access to post office boxes at the time of the accident. (D.I. 22 at 2.) Mr. Dellinger frequently went to his post office box at night. (D.I. 32 at 53.) He testified that the Post Office parking lot area was fairly well lighted. (*Id.* at 66.)

6. According to climatological records, a snowstorm hit lower Delaware on February 11 and 12, 1983, resulting in an accumulation of twenty-one inches of snow on the ground. (DX 10 at 15.) It ceased snowing sometime during the morning of February 12th. (D.I. 32 at 96.) The temperature in Milford on February 12th ranged from 18 degrees to 34 degrees. (DX 10 at 12.)

7. Due to the crippling effects of the snowstorm, the Governor of the State of Delaware proclaimed a State of Emergency at 1:30 p.m. on February 11th. (DX 1.) The Governor requested that citizens stay off the roads except for emergencies. (*Id.*) The State of Emergency remained in effect until 5:00 p.m., February 12th. (DX 2.)

8. On the evening of the day of the accident, February 12, 1983, Mr. Dellinger and his family had visited his parents. (D.I. 32 at 13.) On the way home, at a little after nine o'clock at night, plaintiff took a smaller road in order to enjoy the scenic beauty of the snow. (*Id.* at 15–16.) Plaintiff testified that as he approached the Post Office, he noticed that the parking lot was clear. (*Id.* at 17.) He decided to stop at the Post Office to check his mail. (*Id.*.)

9. Mr. Dellinger turned into the parking lot. (*Id.*) There was a car in the first parking space closest to the front door of the Post Office. (*Id.*) Plaintiff pulled into the next parking space. (*Id.*) He got out of his car and proceeded across the lot towards the sidewalk leading to the front door. (*Id.*) As he passed by the other car, plaintiff slipped on a patch of ice, wrenching his left knee as he fell. (*Id.* at 17–18.) He pulled himself up by holding onto the

parked car and continued towards the Post Office, though he experienced difficulty walking. (*Id.* at 18.) On his return he avoided the ice by holding on to the other car. (*Id.*) Mr. Dellinger did not recall what type of shoes he was wearing at the time of the accident. (*Id.* at 51.)

10. As a result of the accident, plaintiff sprained the medial collateral ligament of his left knee. (Plaintiff's Exhibit ["PX"] 8 at 6.)

11. The custodian for the Post Office testified that he did not recall with certainty if he had salted the parking lot on Friday afternoon. (D.I. 32 at 84.) However, he testified that it was always his practice to salt the parking lot and the sidewalk if it started snowing before he left for home. (*Id.* at 83–84.) Though the custodian normally did not work on weekends, he had an agreement with management to come in on weekends to clear the sidewalks. (*Id.* at 83.) On Saturday, February 12th, the custodian went to the Post Office at quarter to seven in the morning. (*Id.* at 84.) He shoveled off the front sidewalk and the incline leading to the parking lot and also salted the sidewalk and the incline. (*Id.*) The parking lot was too large for him to shovel. (*Id.* at 85.) He then went home. He returned to the Post Office Sunday morning, after the parking lot had been plowed, and salted the lot. (*Id.* at 85, 86.)

12. The superintendent of postal operations at Milford Post Office testified that on Saturday, February 12th, he shoveled off his home driveway sufficiently to get his four-wheel drive Jeep onto the highway. (*Id.* at 96.) He drove to the Post Office and arrived at six o'clock that morning. (*Id.*) Only three of the fifteen employees who normally worked on Saturday were able to make their way into the Post Office. (*Id.* at 97.) No mail was delivered that day since the mail truck could not pull in to the Post Office platform because of the snow. (*Id.*)

13. The superintendent was unable to reach the local business that usually plowed the Post Office parking lot when it snowed. (*Id.* at 97–98.) He arranged, however, for a local resident named Har-ding to plow the lot. (*Id.*) Harding arrived around eleven o'clock in the morning and used a tractor with a front-end loader and a backhoe to clear the lot. (*Id.* at 98, 104.) Both Mr. Dellinger and the superintendent indicated that most of the plowed snow was pushed to a grass area behind the Post Office. (*Id.* at 21–22, 98–99.) Mr. Dellinger testified that snow was also piled along the side of the building adjoining the parking lot. (*Id.* at 22–23.) This side of the building had a sidewalk approximately two to three feet wide running from the front sidewalk back to the grass area. (DX 7.) The superintendent testified that Harding may have pushed some snow on to the sidewalk along the building. (D.I. 32 at 99.)

14. The superintendent examined the parking lot after Harding had finished. (*Id.*) He testified that he thought Harding did "a really good job" and that there "didn't seem to be that much snow" left in the parking lot. (*Id.* at 99–100.) Mr. Dellinger also testified that there were only traces of snow on the parking lot but that otherwise it was very clear. (*Id.* at 16, 30.)

The superintendent left the Post Office to go home at 1:00 in the afternoon on February 12th. (*Id.* at 99.) The other employees had already left. (*Id.*) All Post Office employees who normally reported on Saturday were given credit for eight hours administrative leave due to the snow. (*Id.*) The superintendent did not see the parking lot again until Monday morning; he thought the condition of the parking lot was still very good at that time. (*Id.* at 102.)

15. Mr. Dellinger believed that the source of the ice patch was melted snow from the side of the Post Office. (*Id.* at 19.) He asserted that some of the snow piled along the side of the Post Office had melted and trickled down the incline. (*Id.*) The water formed a shallow puddle in the parking lot which later froze. (*Id.*)

16. Plaintiff also testified that he did not see the ice when he drove into the lot because of the lighting and the car parked adjacent to his own which blocked his view. (*Id.*) However, when he backed out of his

parking space he was able to see the ice patch with the aid of his car headlights. (*Id.*)

17. A photograph of the Post Office submitted by the defendant shows that there is a large light on the side of the Post Office near where the accident occurred. (DX 5.) Testimony by the superintendent indicated that the light was there on February 12, 1983, and that it was on. (D.I. 32 at 100–101.)

18. The exhibits and testimony established that the parking lot had two slight low spots. (DX 5–8; D.I. 32 at 86–87.) Both were in the middle of the parking lot, approximately thirty feet from the location of the alleged accident. (*Id.*)

19. The custodian and superintendent both testified that they did not know of anyone else who had fallen, other than Mr. Dellinger, in the area where the accident occurred. (D.I. 32 at 93, 100.)

### CONCLUSIONS OF LAW

1. Plaintiff filed this cause of action under the Federal Tort Claims Act, 28 U.S.C.A. §§ 2671, *et seq.* (1965). This Court has jurisdiction under 28 U.S.C.A. § 1346(b) (1976), as this is a claim resulting from a personal injury allegedly caused by the negligent conduct of federal employees acting within the scope of their employment. *Hess v. United States,* 666 F.Supp. 666 (D.Del.1987); *United States v. DeCamp,* 478 F.2d 1188, 1191–92 (9th Cir.), *cert. denied,* 414 U.S. 924, 94 S.Ct. 232, 38 L.Ed.2d 158 (1973).

2. This Court must apply the law of Delaware to the issues of this case because the alleged tortious conduct took place in Delaware. *Toole v. United States,* 588 F.2d 403 (3d Cir.1978).

3. Mr. Dellinger was a business invitee of the United States because he implicitly had been invited to enter the property of the Post Office when he arranged to rent a Post Office box. *DiSabatino Brothers v. Baio,* 366 A.2d 508, 510 (Del.1976).

4. It is established law in Delaware that the possessor of property is not an insurer of his business invitees' safety while the

invitee is on the property. *Robelen Piano Co. v. DiFonzo,* 169 A.2d 240, 243 (Del. 1961); *Niblett v. Pennsylvania R.R.,* 158 A.2d 580, 582 (Del.1960). A property possessor's duty to a business invitee is to exercise reasonable care.

The standard of care under Delaware law for a possessor of property who invites others on to his property for business reasons is: To warn the invitee of any unreasonable risk which the possessor of property knows about or in the exercise of reasonable care should know about and which the invitee would not be expected to discover. *DiSabatino,* 366 A.2d at 510; *Hamm v. Ramunno,* 281 A.2d 601, 603 (Del.1971); *Robelen Piano Co.,* 169 A.2d at 244.

5. Plaintiff contends that a property possessor who removes snow from a parking lot or sidewalk must do so in a reasonable and prudent manner. (D.I. 29 at 7) (citing *DiPatre v. McLaughlin,* C.A. 78C–JL–55 (Del.Super.Ct. March 10, 1980); *Del Collo v. MMC Corp.,* C.A. 84C–JA–84 (Del. Super.Ct. April 30, 1986) [Available on WESTLAW, 1986 WL 5869]). He argues that an unreasonably dangerous condition (i.e. the patch of ice) resulted from the Post Office management's failure to exercise reasonable care in removing the snow and its failure to salt the parking area. (D.I. 29 at 8.) The plaintiff asserts that it was reasonably foreseeable that snow piled along the side of the Post Office would melt, flow down into the parking lot and pool. (*Id.*) He further contends that it was foreseeable that the water would subsequently refreeze and that the ice patch would be hidden from view by someone parking their car next to the ice. (*Id.*)

Plaintiff argues that, had the Post Office management properly supervised the snow removal, all of the snow would have been placed on the grass area and none of it would have been placed along the side of the Post Office. (*Id.* at 8–9.) This purportedly would have eliminated the run-off problem. (*Id.* at 9.) He also charges that the supervisor's inspection early Saturday afternoon was insufficient because the temperature was likely to be too high for ice to form. (*Id.*) Mr. Dellinger asserts

that had the parking lot been inspected after the temperature fell, the management would have discovered the ice and applied salt or sand. (*Id.*)

6. The Court disagrees with the contentions of the plaintiff. The Post Office management was not required to use extraordinary care to keep its premises completely clear of snow and ice. It was only required to use reasonable care. The Court finds that the Post Office did exercise reasonable care.

7. The standard of care under Delaware law required that the Post Office warn Mr. Dellinger of known hazards or hazards which it would have known of if it had exercised reasonable care. There is no evidence that the Post Office knew of the ice patch prior to the accident. The evidence indicates that the Post Office supervisor inspected the parking lot after it was plowed and believed that the person who plowed the parking lot had done a good job. (D.I. 32 at 99.) The vast bulk of the snow was placed on the grass area at the rear. (*Id.*) To the extent that any snow was pushed to the side of the building, it must have been very little. Mr. Dellinger testified that the snow to the side of the building was three or possibly four feet high. (*Id.* at 56.) Considering that there was nearly two feet of snow to begin with from normal accumulation, it is clear that the amount of snow pushed to the side of the building was not substantial.

The Court also finds that a reasonable person exercising due care could not be expected to anticipate the chain of events which led to the accident. For instance, a reasonable person would not necessarily expect that much melting and run-off would occur on a day when the temperature climbed to only thirty-four degrees. Considering that a state of emergency was still in effect when the superintendent left the Post Office, it was reasonable to assume that very few people, if any, would be driving to the Post Office and parking their car. Therefore, it was hardly foreseeable that two people would venture to drive to the Post Office in the dark on a Saturday night at approximately the same time, and that one would park so as to block the view of the ice patch for the other.

The Court also rejects Mr. Dellinger's argument that the Post Office was negligent in not inspecting the condition of the parking lot from Saturday at 1:00 p.m. until Monday morning. Contrary to the plaintiff's assertions, the custodian did come to the Post Office and salt the parking lot on Sunday morning. (*Id.* at 86.) Furthermore, it is unreasonable to expect that the Post Office keep a constant vigil over its premises.

8. The cases cited by the plaintiff, *DiPatre* and *Del Collo*, do not compel this Court to reach a different conclusion. In both cases the court held that it was up to the trier of fact to determine whether the defendants had acted reasonably in removing snow from their walkways. As both cases were jury trials, the court made no such determinations.

9. Given the Court's conclusion that Mr. Dellinger has failed to meet his burden of proof by a preponderance of the evidence that the United States breached its duty to maintain the parking lot of the Milford Post Office in reasonably safe condition, it is unnecessary to consider the United States' affirmative defense that Mr. Dellinger was contributorily negligent.

A judgment order will be entered in accordance with these Findings of Fact and Conclusions of law.